FRANK DELVECCHIO, Indiv. and as Special Adm'r of the Estate of Mary Delvecchio, Plaintiffs-Appellees, v. GENERAL MOTORS CORPORATION, Defendant-Appellant (B.B.B. Motors, Defendant).

Fifth District   No. 5—91—0475

Opinion filed December 21, 1993.

RARICK, J., concurring in part and dissenting in part.

Edward S. Bott, Jr., of Thompson & Mitchell, of Belleville, and Kent B. Hanson, of Bowman & Brooke, of Minneapolis, Minnesota, for appellant.

Amiel Cueto, of Cueto, Cueto & Cueto, Ltd., of Belleville, for appellees.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiff, Frank Delvecchio, brought an action in the circuit court of St. Clair County against defendant, General Motors, to recover damages for injuries sustained in an automobile accident. Following a trial, the jury returned a verdict in favor of General Motors on all counts. Plaintiff's motion for a new trial was granted, and General Motors appealed. We affirm.

## I

On December 10, 1988, Frank Delvecchio and his wife, Mary, were on their way to a wedding reception. Driving south on Illinois 159, Mr. Delvecchio, who was driving, intended to turn right onto Illinois Route 15 but missed the entrance. He drove under the Route 15 overpass, turned around, and headed back north. Mr. Delvecchio attempted to turn left onto the Route 15 entrance but was unable to negotiate the turn, which was tighter than 90 degrees. The car jumped the curb and crashed into an embankment, throwing Mr. and Mrs. Delvecchio forward into the windshield. Mr. Delvecchio was seriously injured, and Mrs. Delvecchio was killed.

Plaintiff filed suit against General Motors Corporation and B.B.B. Motors, alleging that the accident was caused by the stalling of the engine. Counts I, II, III, V, and VI were directed against General Motors, and counts IV and VII were directed against B.B.B. Motors, the dealership from which Delvecchio purchased his car. Defendant B.B.B. Motors filed a motion for summary judgment which was granted. Plaintiff filed his third amended complaint, containing six counts, all directed against General Motors. Counts I, II, and III were brought by Frank Delvecchio in his individual capacity,

and counts IV, V, and VI were brought by Frank Delvecchio in his capacity as special administrator of the estate of Mary Delvecchio. Counts I and II both sought damages based upon products liability, but count II advanced the doctrine of *res ipsa loquitur*. Counts IV and V sought damages for wrongful death, and count V also advanced the doctrine of *res ipsa loquitur*. General Motors denied that the engine had stalled and took the position that the engine was still running at the time of impact and that plaintiff's version of the collision was not possible in that the vehicle's condition conclusively established that the engine had not stalled.

The trial court granted General Motors' motion to dismiss on count II and count V, the two counts relying on *res ipsa loquitur*. Plaintiff subsequently filed his fourth amended complaint, which renumbered counts I, III, IV, and VI of the third amended complaint as counts I, II, III, and IV, respectively.

On May 25, 1989, plaintiff served discovery requests on General Motors. Plaintiff requested, *inter alia*, the production of:

"Reports, documents, letters, correspondence, factual summaries, memoranda, notes, markings or tangible things regarding any complaints of any occurrence in which it was alleged that the engine on a General Motors vehicle suddenly died while the engine was running."

Defendant objected, arguing that the request was overbroad, unduly burdensome, and unreasonably oppressive, because it was not limited to a specified time period or to vehicles of the same model as the one involved in the accident. In August 1989, General Motors produced 237 reports of alleged stalls involving 1987 Oldsmobile Cutlass Cieras.

In December 1989, General Motors filed a motion requesting that it be allowed to inspect the Delvecchio vehicle. A hearing on this motion was held during which the trial court also heard plaintiff's arguments regarding General Motors' discovery responses. Apparently the trial court declined to rule on General Motors' objections and instead instructed the parties to try to work out a compromise. Pursuant to an agreement by the parties, the trial court entered an order in which General Motors, without waiving its objections, agreed to produce the documentation sent *to* the National Highway Traffic Safety Administration (NHTSA) on or about December 22, 1987, and February 14, 1989, in response to information requests by NHTSA dated October 5, 1987, and September 16, 1988, pertaining to allegations of engine stalling on certain 1986-

1987 General Motors' "A, C, E and H" body vehicles with 3.8-liter, V-6 engines.

At the time, General Motors was in possession of 135 other reports of engine stalls on 1986 and 1987 A, C, E, and H body vehicles with 3.8-liter, V-6 engines. These reports had been sent *from* NHTSA to General Motors. General Motors did not produce these reports. Plaintiff's counsel discovered the existence of these reports through a Freedom of Information Act request. Shortly before trial was to begin, plaintiff served notices under Supreme Court Rule 237 (134 Ill. 2d R. 237) to produce four General Motors employees to give testimony at trial. General Motors made a motion *in limine* to quash the Rule 237 notices. At the hearing on this motion, plaintiff first indicated that General Motors had not complied with the agreed discovery order and that there were additional documents which should have been disclosed.

On the first day of trial, plaintiff made a motion pursuant to Rule 237 to require Terry Thomas, General Motors' product investigation manager, to bring these reports with him when he appeared to testify. He did so, and the 135 reports were admitted into evidence as plaintiff's exhibit No. 30.

Delvecchio's testimony at trial indicated that the point where the engine allegedly stalled was approximately 900 feet from the point where the crash occurred. Delvecchio testified that he was only traveling 10 to 15 miles per hour and that he stepped on the brake when the engine stalled and continued to do so until the crash occurred.

William Rosenblath, a forensic engineer, testified on behalf of plaintiff. Rosenblath indicated that he was the owner of Automotive Systems Analysis, Inc., a company he formed for the purpose of "investigating automotive product behavior and characterizing automotive product performance in response to certain malfunction conditions." Rosenblath opined that the engine of Delvecchio's car stalled as the result of a malfunction of the throttle and/or the PROM (programmable read only memory) in the engine control system. Rosenblath noted that a General Motors service manual referred to intermittent stalling in cars using the same engine as the Delvecchio car and that a DTB, or dealer technical bulletin, dealing with cars with the same engine type as the Delvecchio car, indicated that a small amount of dirt or residue in the throttle bore could result in engine stalling. He further noted that a manufacturers' bulletin published on June 9, 1987, indicated that it could be necessary to replace the PROM. Rosenblath testified that the

PROM in the Delvecchio car was the original, or "down level" PROM, rather than the "current level" PROM. Rosenblath was unable to determine the relative contribution to the engine stalling of dirt in the throttle bore and the PROM but was certain that the stall was caused by a combination of the two.

Richard Maiers, senior staff analysis engineer for General Motors, testified that his responsibilities included analysis and testing of various automatic components and systems, including engine controls, accelerator controls, and steering and braking system performance. Maiers testified that an inspection of the vehicle revealed that the lower radiator hose had severe wear marks from a rotating pulley and belt assembly. Maiers stated that this occurred as a result of the radiator assembly frame bumper being forced back toward the engine and the hose being forced into the pulley assembly for the air conditioner. Maiers testified such evidence demonstrated that the engine of Delvecchio's car was still running at the time of impact.

The jury returned a verdict for General Motors on all counts. Plaintiff subsequently filed a motion seeking a new trial. Plaintiff argued that General Motors' failure to produce the 135 reports sent from the NHTSA to General Motors constituted discovery abuse and that pursuant to *Samansky v. Rush-Presbyterian-St. Luke's Medical Center* (1990), 208 Ill. App. 3d 377, 567 N.E.2d 386, and *Lynch v. Precision Machine Shop, Ltd.* (1982), 93 Ill. 2d 266, 443 N.E.2d 569, the trial court had erred in striking plaintiff's strict products liability counts which were based on *res ipsa loquitur*. The trial court granted plaintiff's motion for a new trial on the merits, finding that a new trial was warranted based upon *Samansky* and as a result of discovery abuse by General Motors.

II

On appeal, General Motors argues that the trial court erred in ordering a new trial. General Motors maintains that a new trial was not required by *Samansky* and that the trial court erred in finding that General Motors violated the rules of discovery.

It is well settled that a motion for a new trial is addressed to the sound discretion of the trial court, and the trial court's decision will not be disturbed on appeal absent a clear abuse of that discretion. (*Villa v. Crown Cork & Seal Co.* (1990), 202 Ill. App. 3d 1082, 560 N.E.2d 969; *Thompson v. Abbott Laboratories* (1990), 193 Ill. App. 3d 188, 549 N.E.2d 1295.) Likewise, the imposition of sanctions for failure to comply with discovery rules is within the broad

discretion of the trial court, and the trial court's rulings will be upheld on review absent a clear abuse of that discretion. (*Wakeford v. Rodehouse Restaurants of Missouri, Inc.* (1991), 223 Ill. App. 3d 31, 584 N.E.2d 963, *aff'd* (1992), 154 Ill. 2d 543, 610 N.E.2d 77; *Knecht v. Radiac Abrasives, Inc.* (1991), 219 Ill. App. 3d 979, 579 N.E.2d 1248; *Wegman v. Pratt* (1991), 219 Ill. App. 3d 883, 579 N.E.2d 1035.) With these standards in mind, we turn to a review of General Motors' arguments.

### A

In granting plaintiff's motion for a new trial, the trial court concluded that, pursuant to *Samansky*, its dismissal of count II and count V of plaintiff's third amended complaint was erroneous. Both count II and count V of plaintiff's third amended complaint stated a cause of action for strict products liability premised on the doctrine of *res ipsa loquitur*.

In *Samansky*, the plaintiff sought damages for injuries sustained during the surgical removal of a central venous catheter (CVP) that had fractured and remained in his body following coronary bypass surgery. Count I of plaintiff's complaint was directed against defendant Deseret Medical, Inc., and stated a cause of action in products liability. Count IV, also directed against Deseret, alleged that Deseret had been negligent in its design, manufacture, and failure to warn of the dangers of the CVP line. Plaintiff alleged his reliance on the doctrine of *res ipsa loquitur* to prove both claims. Count II of the complaint was directed against the defendant physicians, and count III was directed against defendant Rush. Both sounded in negligence, and both relied on the doctrine of *res ipsa loquitur*. Defendant Deseret, Inc., and defendant physicians moved for summary judgment. Ultimately, the trial court treated the motions for summary judgment as motions to dismiss and dismissed all four counts of plaintiff's complaint. The trial court concluded that the doctrine of *res ipsa loquitur* could not benefit plaintiff in his claims.

On appeal, the court in *Samansky* first analyzed the propriety of the dismissal of the three negligence counts. The defendants argued that plaintiff could not invoke the doctrine of *res ipsa loquitur* with respect to those counts because the plaintiff failed to show that the defendants had joint, concurrent control over the instrumentality that caused plaintiff's injuries. Relying on *Gatlin v. Ruder* (1990), 137 Ill. 2d 284, 560 N.E.2d 586, the court rejected defendants' argument, holding that because the record demon-

strated that defendants exercised *consecutive* control over the CVP line, plaintiff had satisfied the requirement set forth in *Gatlin* for application of the *res ipsa loquitur* doctrine. The court held that the trial court erred in dismissing the negligence counts.

The court then turned to an analysis of the propriety of the dismissal of the products liability count against Deseret, Inc. Plaintiff argued that *res ipsa loquitur* should apply to a products liability suit. The court, however, declined to hold that *res ipsa loquitur* principles were *per se* applicable to products liability claims. Instead, the court relied upon a line of Illinois cases which recognize a principle, similar to *res ipsa loquitur*, which allows a plaintiff to prove a case of products liability through circumstantial evidence which affords a reasonable inference that the product was defective when it left the manufacturer's control and that such defect was the proximate cause of plaintiff's injuries. The court held that plaintiff's proof was sufficient to create a triable issue of fact and that the trial court erred in dismissing plaintiff's product liability count.

In the present case, the trial court relied upon *Samansky* as one of the bases for granting a new trial. The trial court noted that plaintiff's expert, William Rosenblath, testified during trial that defendant's car was equipped with a "down level PROM" and that the "down level PROM" was the proximate cause of the stall. The *Samansky* court also stated that Illinois decisions have consistently held a plaintiff's proof sufficient to present a triable issue of fact where the plaintiff has produced expert testimony that the defendant's product was defective when it left defendant's control and was a proximate cause of plaintiff's injury.

Unlike *Samansky*, plaintiff in the present case did proceed to trial on the remaining four counts of his complaint.

While this case went to trial on other products liability counts, that does not render the trial court's initial dismissal of the *res ipsa loquitur* counts of no consequence. Plaintiff was by this dismissal improperly deprived of a theory upon which to try his case. Adopting the *Samansky* position that, technically, not *res ipsa loquitur* but a variant of it could be applicable to products liability cases, we examine *Lynch v. Precision Machine Shop, Ltd.* for guidance in determining the application of this semi-*res-ipsa-loquitur* theory.

The *Lynch* court first explained the *res ipsa loquitur* doctrine:

> "As has been repeatedly observed by this court, the *res ipsa loquitur* doctrine allows the trier of fact to draw an inference of negligence from circumstantial evidence. To avail itself of

the doctrine, plaintiff (in our case, counterclaimant) must demonstrate that he was injured (1) in an occurrence that would not have occurred in the absence of negligence, (2) by an instrumentality or agency under the management or control of the defendant (here, counterdefendant), and (3) under circumstances indicating the injury was not due to any voluntary act or neglect on the part of the one claiming the doctrine." (*Lynch*, 93 Ill. 2d at 272, 443 N.E.2d at 572.)

The court proceeded to quote Dean Prosser concerning the question of control:

" 'This element usually is stated as meaning that the defendant must be in "exclusive control" of the instrumentality which has caused the accident. Such control of course does serve effectively to focus any negligence upon the defendant; but the strict and literal application of the formula has led some courts to ridiculous conclusions \*\*\*. Of course this is wrong: it loses sight of the real purpose of the reasoning process in an attempt to reduce it to a fixed, mechanical and rigid rule. *"Control," if it is not to be pernicious and misleading, must be a very flexible term. It must be enough that the defendant has the right or power of control, and the opportunity to exercise it* \*\*\*. It is enough that he is under a duty which he cannot delegate to another \*\*\*.' (Prosser, Torts sec. 39, at 219-20 (4th ed. 1971).)" (Emphasis added.) (*Lynch*, 93 Ill. 2d at 273, 443 N.E.2d at 572.)

The court then drew from the Restatement (Second) of Torts, the explanatory notes to section 328D, Comment *g*, at 161 (1965), which in relevant part states:

" 'It may be enough that the defendant was formerly in control, at the time of the probable negligence \*\*\*. Exclusive control is merely one fact which establishes the responsibility of the defendant; and if it can be established otherwise, exclusive control is not essential to a res ipsa loquitur case. The essential question becomes one of whether the probable cause is one which the defendant was under a duty to the plaintiff to anticipate or guard against.' " (*Lynch*, 93 Ill. 2d at 273-74, 443 N.E.2d at 573.)

Later, the court stated:

"In adopting a flexible standard of control, we note that *res ipsa loquitur* is simply a rule of evidence relating to the sufficiency of plaintiff's proof. [Citation.] If the three requisite factors are established, the doctrine simply gives rise to

a permissible inference of negligence. It permits, but does not compel, the trier of fact to find that the defendant acted negligently." *Lynch*, 93 Ill. 2d at 274, 443 N.E.2d at 573.

In light of *Lynch* and *Samansky*, the trial court was correct in determining that it had acted prematurely in removing the two *res ipsa loquitur* counts from this case. As our supreme court noted, *res ipsa loquitur* is an inference of evidence as opposed to a rule of law, and the trial court correctly concluded that on a retrial this theory should be taken to the point of submission of evidence before the trier of fact. Since, as the supreme court noted, *res ipsa loquitur* is a rule of evidence, the trial court upon reconsideration decided it was more appropriate to wait for some evidence concerning the question of control. The testimony by William Rosenblath, a forensic engineer, when viewed in the light of *Lynch*, is sufficient for the trial court to grant a new trial on the basis of this *res ipsa loquitur* variant. Rosenblath's testimony would provide a sufficient basis for a *res ipsa loquitur* variant.

Defendant argues that even if *res ipsa loquitur* were to be relied upon in a products case, it would not help the plaintiff, citing the case of *Saieva v. Budget Rent-A-Car* (1992), 227 Ill. App. 3d 519, 591 N.E.2d 507. The recitation of the *res ipsa loquitur* theory by the *Saieva* court, however, appears contrary to the characterization of *res ipsa loquitur* by our supreme court in *Lynch*. Likewise, the other automobile cases cited, specifically, *Wuench v. Ford Motor Co.* (1982), 104 Ill. App. 3d 317, 432 N.E.2d 969, and *Silverman v. General Motors Corp.* (1981), 99 Ill. App. 3d 593, 425 N.E.2d 1099, are factually distinguishable from this case due to the intervening servicing in *Silverman* and the nature of the complained-of failing part in *Wuench*, a left rear axle.

Plaintiff should have been allowed to plead, and subsequently bring to trial, a variant of *res ipsa loquitur* as noted in *Samansky*. The trial court therefore acted properly in granting a new trial to plaintiff on this ground.

B

We next address General Motors' argument that the trial court erred in ordering a new trial based upon its discovery abuse. General Motors maintains that there was no discovery abuse. The trial court found that General Motors violated discovery rules by failing to produce the documents in plaintiff's exhibit No. 30 before trial. Exhibit No. 30 consisted of 135 customer complaints which had been sent to General Motors by the NHTSA. The trial court noted

that five of the complaints in exhibit 30 were very similar to the Delvecchio complaint in several respects and had the documents been produced, plaintiff could potentially have called those complainants as witnesses. The trial court determined that the resulting prejudice to the plaintiff was severe enough to warrant a new trial.

As noted above, General Motors initially objected to plaintiff's discovery request. Rather than rule on General Motors' objections, the trial court encouraged the parties to work out a compromise, which they did. Pursuant to that agreement, General Motors agreed to "produce the documentation *sent to* NHTSA" (emphasis added) in response to certain NHTSA requests. General Motors produced a list of 237 complaints. What General Motors did not produce was 135 similar complaints sent *from* the NHTSA to General Motors in October of 1987.

Plaintiff maintained, and the trial court apparently agreed, that such reports were contemplated by the trial court's order. We agree. The request for production to which General Motors responded read as follows:

"Reports, documents, letters, correspondence, factual summaries, memoranda, notes, writings or tangible things regarding any complaints or reports of any occurrence in which it was alleged that the engine on a General Motors vehicle suddenly died while the vehicle was running."

The trial court in assessing the prejudice to plaintiff found and reasoned as follows:

"Initially this court finds that defendant, General Motors, violated the Rules of Discovery by its failure to produce the documents in plaintiff's exhibit #30 [the 135 reports] before trial. The plaintiff was clearly entitled to all reports of stalling on vehicles equipped with engines the same as the Delvecchio car, and the documents in plaintiff's exhibit #30 were all reports of stalls on vehicles with the same engine system as that in the plaintiff's car. On October 13, 1987, approximately 1-1/2 years before plaintiff's discovery request, the documents contained in plaintiff's exhibit #30 were in the possession of General Motors. Although General Motors produced numerous documents reflecting complaints, it omitted the reports in exhibit #30 from those produced. Plaintiff discovered that there were some additional 135 complaints only by the use of a Freedom of Information request to the federal government. The plaintiff only then discovered that these complaints were not among those disclosed by cross-ref-

erencing the names in plaintiff's exhibit #30 against all complaints provided by General Motors. The documents were made available to plaintiff on January 26, 1991, three days into trial, and only then after the plaintiff had raised the issue of discovery fraud.

Once a failure to comply with discovery rules has been shown, the burden is on the non-disclosing party to explain that failure. Thus in the case at bar the burden was on defendant General Motors to explain why it failed to produce the 135 reports before trial. General Motors has never given any satisfactory explanation. General Motors merely refers to all the documents that it did produce to somehow explain the failure to disclose those in exhibit #30. Those reports in exhibit #30 were important to the plaintiff's case, because they were reports by people who were so concerned by the stalling problem that they complained to the federal government. Many of these people had been involved in accidents. The plaintiff should not have had to make an F.O.I. request to get these reports. General Motors should have produced them. These documents were clearly contemplated by plaintiff's discovery requests.

In *Buehler v. Whalen* (70, [*sic*] Ill. 2d 51, 374 N.E.2d 460, Sup. Ct. 197[7]), the court was confronted with a situation where Ford Motor Company secreted evidence damaging to its case as well as giving false answers to interrogatories. In commenting on the situation the court stated that, 'attorneys who wish to conduct the practice of law on a long-distance basis, should advise their clients that Illinois Courts will not tolerate fractional discovery or fractional disclosure.' In addition, in the *Buehler* case, plaintiff's attorney had obtained the secreted evidence from some other litigation. The court called this a 'sad commentary on the effectiveness of the discovery here.' In Delvecchio, the defendant engaged in 'fractional disclosure' and the fact of it was only discovered by obtaining the information from the plaintiff's F.O.I. request.

In *Ostendorf v. International Harvester [Co.]*, [*sic*] (89 Ill. 2d 273, 433 N.E.2d 253, Sup. Ct. 1982), the defendant also, as in *Buehler*, failed to fully disclose pursuant to discovery requests. The court stated, 'in the context of discovery, which is supposed to be conducted in good faith and a spirit of cooperation for the purpose of ascertaining the truth, such half-truths are equivalent to outright lies.' The actions of the

defendant, General Motors, are similar to the actions criticized by the Supreme Court in *Buehler* and *Ostendorf*.

The court next turns to the issue of whether or not the failures in discovery caused any prejudice to the presentation of plaintiff's case. The court has personally examined plaintiff's exhibit #30 to determine if the complaints in the documents were similar to the Delvecchio complaint in regard to stalling. A cursory and partial examination revealed 5 complaints very similar to the Delvecchio complaint especially in regard to vehicle mileage at onset of complaint and difference in time from purchase date to onset of complaint. If these documents had been produced as they should have been, the plaintiff would have had an opportunity to interview those complainants as potential witnesses and perhaps change the course of the trial. The court has already commented on the fact that these complainants were concerned enough to report to the government and many had been involved in accidents because of the stall. The plaintiff did introduce the testimony of six witnesses who had experienced stalls, but none had been involved in accidents, as had many of the complainants in plaintiff's exhibit #30. (These six witnesses were not among the complainants in plaintiff's exhibit #30). [*Sic*] Since plaintiff was denied that opportunity to investigate these complaints prior to trial, no one will ever know their effect unless a new trial is granted. After weighing the prejudice to plaintiff by defendant's discovery violation, it is ordered that plaintiff be granted a new trial as a sanction for defendant's discovery violation. This sanction is entered not to punish General Motors, but to comply with our Supreme Court's rule in *Buehler*, that it is the responsibility of trial courts to make full disclosure a reality."

In arguing that no discovery violation occurred, General Motors focuses on the language of the agreed order noted above. This language, however, is actually evidence of the discovery fraud since defendant was aware of the existence of 135 complaints sent *from* the NHTSA at the time it made this agreement. This is an excellent example of the intentionally incomplete and misleading discovery compliance condemned by our supreme court in *Buehler v. Whalen* (1977), 70 Ill. 2d 51, 374 N.E.2d 460, and *Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 433 N.E.2d 253.

In *Buehler*, a plaintiff's interrogatory to the defendant, Ford Motor Company, inquired whether Ford or one of its subsidiaries

was ever submitted a report or opinion recommending against the use of a certain fuel system. Ford's answer was that it had received no such report; in fact, a report had been submitted to a Ford subsidiary. A Ford expert was confronted with the report in cross-examination; the plaintiff's attorney had found the report in other litigation. The plaintiff moved to strike the defendant's pleadings, but the trial court instead held a contempt hearing and found no contempt in an order containing the following language:

> " 'The court feels, however, that Ford Motor Co. did withhold evidence it could have easily discovered and then made available to the other parties. The court has found the defendant Ford not guilty of contempt only because of the *technical language* of the various requests made to Ford to produce certain information.' " (Emphasis added.) (*Buehler*, 70 Ill. 2d at 66, 374 N.E.2d at 467.)

The response of our supreme court was clear and emphatic:

> "We find no 'technical language' in the requested discovery. And we cannot condemn too severely the conduct of the Ford Motor Corporation in the discovery procedures here. It gave false answers to interrogatories under oath. It secreted evidence damaging to its case. Under the circumstances, the trial court would have been justified in striking the answer of this defendant and submitting to the jury only the issue of damages.

> Our discovery procedures are meaningless unless a violation entails a penalty proportionate to the gravity of the violation. Discovery for all parties will not be effective unless trial courts do not countenance violations, and unhesitatingly impose sanctions proportionate to the circumstances. These are already in Rule 219(c). It provides for varied sanctions, including contempt proceedings. But a contempt procedure is hardly a sanction in reality. The order can, of course, be appealed. The worst penalty is the payment of a nominal fine. Meanwhile, the opposing party may well have been forced to trial without truth, and truth is the heart of all discovery.

> Disclosure is the object of all our discovery procedures. It is the opinion of this court that trial courts should make disclosure a reality. Here discovery has long since been completed. Had the jury here found in favor of Ford, a civil contempt adjudication would have given little satisfaction to plaintiffs. As a minimum, it would have been proper to grant plaintiffs a new trial solely on the issue of damages. And

even that relief, with the time and money involved, is pragmatically inadequate. Here, of course, judgment was entered in favor of plaintiffs. Under these circumstances we think that denial of [defendant's] motion for a new trial lay within the discretion of the trial court." *Buehler*, 70 Ill. 2d at 67, 374 N.E.2d at 467.

Later, in *Ostendorf*, the supreme court again condemned partial and misleading discovery responses:

"The existence of these reports, which are clearly material embraced by the interrogatories, demonstrates International Harvester's failure to comply with the requirements of full and frank disclosure imposed by our discovery rules. In light of these documents, International Harvester's responses were, if not outright falsehoods, half-truths of the type condemned in *Buehler v. Whalen* (1977), 70 Ill. 2d 51, 64-68[, 374 N.E.2d 460, 466-68]. In the context of discovery, which is supposed to be conducted in good faith and a spirit of cooperation for the purpose of ascertaining the truth, such half-truths are equivalent to outright lies. They have the effect of affirmative concealment, since they imply that there is no information or evidence to be sought. They inevitably tend to mislead opposing counsel into the belief that further inquiry is not needed." 89 Ill. 2d at 282, 433 N.E.2d at 257.

In *Williams v. A.E. Staley Manufacturing Co.* (1981), 83 Ill. 2d 559, 565, 416 N.E.2d 252, our supreme court noted the purpose of discovery is " 'to illuminate the actual issues in the case rather than to harass and obstruct the opposing litigant,' " quoting *People ex rel. General Motors Corp. v. Bua* (1967), 37 Ill. 2d 180, 193, 226 N.E.2d 6. The court further noted the practical effects of discovery abuse:

"When an attorney attempts to use discovery rules and sanctions as weapons in a war of inconvenience, instead of the truth-seeking purposes for which they were designed, he does a disservice not only to the court and his colleagues at the bar, but also to his client, since his pettifogging makes more difficult a realistic review of the merits of the client's claim or defense." (*Williams*, 83 Ill. 2d at 565, 416 N.E.2d at 255.)

Our supreme court then noted the consequences of discovery abuse:

"Discovery is not a tactical game, and Rule 219(c) (73 Ill. 2d R. 219(c)) provides remedies against unreasonable opponents. Discovery is intended as, and should be, a cooperative undertaking by counsel and the parties, conducted largely

without court intervention, for the purpose of ascertaining the merits of the case and thus promoting either a fair settlement or a fair trial. For those who use it to impede and harass, this court's admonition in *Buehler v. Whalen* (1977), 70 Ill. 2d 51, 67[, 374 N.E.2d 460, 467], is appropriate: 'Discovery for all parties will not be effective unless trial courts do not countenance violations, and unhesitatingly impose sanctions proportionate to the circumstances.' " *Williams*, 83 Ill. 2d at 566, 416 N.E.2d at 256.

In *Boettcher v. Fournie Farms, Inc.* (1993), 243 Ill. App. 3d 940, 612 N.E.2d 969, this court recently reversed a trial court that refused to grant a new trial based on false answers to discovery and in so doing issued the following warning:

"Whether omissions in discovery are intentional or inadvertent, this court will neither condone nor tolerate false, incomplete, or inaccurate discovery. Parties should be aware that all of the remedies under Supreme Court Rule 219 are available to both trial courts and this court pursuant to Supreme Court Rule 366(a)(5) (134 Ill. 2d R. 366(a)(5)). Trial courts should not be hesitant, and we will not be hesitant, to provide remedies under Supreme Court Rule 219, if requested." *Boettcher*, 243 Ill. App. 3d at 948, 612 N.E.2d at 974-75.

█ In the case at hand, the trial court did exactly what we encouraged in *Boettcher* and the supreme court commanded in *Buehler, Williams*, and *Ostendorf*. After carefully reviewing the circumstances, it found that an intentional discovery violation had occurred and that a party had been prejudiced. In the exercise of its discretion, the trial court ordered a new trial pursuant to Rule 219(c). We do not deny that General Motors complied with the agreed order in a strictly literal sense. It is equally clear, however, that such "compliance" was not in keeping with the purpose and spirit of our discovery rules. To give full effect to the purpose of discovery, we must look beyond the veneer of literal compliance and determine whether there has been compliance in a meaningful sense. There can be no doubt that the material withheld was contemplated by the agreed order, regardless of the exact language used. To hold otherwise would be a triumph of form over substance, something that is the antithesis of discovery practice.

### III

█ General Motors raises numerous other arguments with respect to the manner in which the first trial was conducted. Having

reviewed the record, we find that these arguments are either without merit or are so inconsequential that they are harmless.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed and remanded with directions to grant plaintiff leave to amend counts II and IV.

Affirmed and remanded with directions.

MAAG,* J., concurs.

JUSTICE RARICK, concurring in part and dissenting in part:

While I agree with the majority that the trial court was correct in ordering a new trial because of General Motors' violation of discovery rules, I disagree with the holding that the trial court was correct in ordering a new trial based upon its previous dismissal of the *res ipsa loquitur* counts.

I agree with the defendant that even if the doctrine of *res ipsa loquitur* could be relied upon in products liability cases, it would not avail the plaintiff in the present case.

> "The purpose of the *res ipsa loquitur* doctrine is to allow proof of negligence by circumstantial evidence when the direct evidence concerning the cause of the injury is primarily within the knowledge and control of defendant. [Citations.] To prevail under a *res ipsa loquitur* theory, plaintiff must establish: '(1) that the occurrence is one that ordinarily does not occur in the absence of negligence and (2) that the defendant had exclusive control of the instrumentality that caused the injury.' " (*Saieva v. Budget Rent-A-Car* (1992), 227 Ill. App. 3d 519, 528-29, 591 N.E.2d 507, 513, quoting *Dyback v. Weber* (1986), 114 Ill. 2d 232, 242.)

Under such circumstances, the accident itself affords reasonable evidence, in the absence of an explanation by the defendant, that the accident arose from want of due care. (*Metz v. Central Illinois Electric & Gas Co.* (1965), 32 Ill. 2d 446, 448-49, 207 N.E.2d 305, 307.) Where the evidence does not necessarily support an inference that the accident was the result of the defendant's negligence, the doctrine does not apply. (*Rinck v. Palos Hills Consolidated High School District No. 230* (1979), 82 Ill. App. 3d 856, 403 N.E.2d

---

*Justice Welch had participated in oral argument but recused himself; Justice Maag joined the advisement panel in substitution of Justice Welch and has been provided with the briefs and audiotape of oral argument.

470.) The record in the present case discloses that the Delvecchio car was over a year old and had been driven more than 14,000 miles. In *Wuench v. Ford Motor Co.* (1982), 104 Ill. App. 3d 317, 432 N.E.2d 969, plaintiff filed a complaint against Ford Motor Company alleging that the left rear axle of his car broke off, causing the car to crash and injure plaintiff. Plaintiff sought to rely upon the doctrine of *res ipsa loquitur*, but in upholding the trial court's dismissal of the *res ipsa loquitur* count, the court held that plaintiff's intervening possession of the automobile for almost four months presented a plausible explanation for the accident other than the negligence of defendant and that the doctrine of *res ipsa loquitur* was therefore inapplicable. *Wuench,* 104 Ill. App. 3d at 319-20, 432 N.E.2d at 970-71.

In *Silverman v. General Motors Corp.* (1981), 99 Ill. App. 3d 593, 425 N.E.2d 1099, plaintiff was involved in a one-car accident in which he was injured and his wife killed. At trial, plaintiff's theory of the accident was that a defect in the throttle body extension caused it to break off and jam the throttle mechanism in the open position. At the close of all the evidence, the trial court directed a verdict for the defendant. Plaintiff's principal contention on appeal was that the trial court erred in directing a verdict on the *res ipsa loquitur* count. In affirming the trial court, the court in *Silverman* found that because the car had been in plaintiff's possession for 51 days, driven over 2,000 miles, and serviced by several individuals, the record failed to demonstrate defendant's opportunity to exercise control over the vehicle. The court also noted that the testimony indicated that the decedent must not have been properly attentive to the operation of the vehicle and that plaintiff failed to eliminate the possibility that the decedent may herself have been at least partially responsible for the accident. *Silverman,* 99 Ill. App. 3d at 600, 425 N.E.2d at 1104-05.

As in *Wuench* and *Silverman,* Delvecchio's intervening possession and use of the automobile exceeding 14,000 miles would defeat any inference of negligence. Furthermore, there is evidence from which it could be inferred that the accident occurred because Delvecchio was at least inattentive to his driving. Delvecchio, who was 70 years old at the time of the accident, had gotten up early that day to go to Peoria. Upon returning, he and his wife left for the wedding reception. He missed the Route 15 exit at first and had to turn around. The distance from the point where he testified the engine stalled to the point of impact was over 900 feet, yet Delvecchio claimed that he was only traveling 10 to 15 miles per

hour when the stall occurred. The doctrine of *res ipsa loquitur* applies only where the surrounding circumstances indicate that the injury was not the result of any voluntary act or neglect on the part of the plaintiff. (*Lynch v. Precision Machine Shop, Ltd.* (1982), 93 Ill. 2d 266, 443 N.E.2d 569.) That is not the case here.

The majority seeks to distinguish *Wuench* based upon the nature of the complained-of failing part and to distinguish *Silverman* based upon the intervening servicing. Neither the similarity or dissimilarity of the failing part nor the intervening servicing is the relevant issue. The relevant issue is whether there is evidence in the record that overcomes the inference of negligence. In *Wuench*, it was plaintiff's intervening possession of the automobile for four months that destroyed the inference of negligence. In *Silverman*, it was plaintiff's intervening possession of the automobile for 51 days, the fact that it had been serviced by at least three people, *and evidence indicating that the decedent was inattentive to her driving* that destroyed the inference of negligence. In the present case, as in *Silverman*, there is evidence which strongly indicates that Delvecchio was inattentive to his driving and that his inattention was the cause of the accident. Furthermore, there is evidence indicating that the engine did not stall but was still running at the time the automobile crashed into the embankment. The evidence does not, therefore, necessarily support an inference that the accident was the result of General Motors' negligence, and the doctrine of *res ipsa loquitur* is inapplicable.