DON THOMAS, Plaintiff-Appellee, v. CROUSE-HINDS, ECM, a Division of Cooper Industries, Inc., Defendant and Counterplaintiff-Appellant and Third-Party Plaintiff-Appellant (National Steel Corporation, d/b/a Granite City Steel, *et al.*, Defendants and Counterdefendants-Appellees; Sachs Electric Company, Third-Party Defendant-Appellee).

Fifth District   No. 5—94—0392

Opinion filed August 24, 1995.

Arnstein & Lehr, of Chicago (Louis A. Lehr, Jr., Arthur L. Klein, and Mark E. Enright, of counsel), and Walker & Williams, of Belleville, for appellant.

Bruce N. Cook and Harriet H. Hamilton, both of Cook, Shevlin, Ysursa, Brauer & Bartholomew, Ltd., of Belleville, for appellee Don Thomas.

Neville, Richards, DeFranco & Wuller, of Belleville (James E. DeFranco, of counsel), for appellee National Steel Corp.

John L. McMullin and T. Michael Ward, both of Brown & James, P.C., of St. Louis, Missouri, for appellee Davey McKee, Inc.

William L. Hanks, of Keefe & De Pauli, P.C., of Fairview Heights, for appellee Sachs Electric Co.

JUSTICE WELCH delivered the opinion of the court:

This case arises out of an injury sustained by plaintiff, Don Thomas, while he was employed as an electrician by third-party defendant, Sachs Electric Company (Sachs). On September 14, 1990, plaintiff was working on a construction project at Granite City Steel installing electrical conduit pipe on the outside of a newly constructed casting building. Plaintiff, who was standing on a ladder tightening a 10-foot section of conduit pipe into a Crouse-Hinds LB67 conduit elbow, fell to the ground when the conduit elbow broke. Plaintiff suffered serious injuries as a result of the fall.

Plaintiff subsequently filed suit against, *inter alia*, defendants Crouse-Hinds, the manufacturer of the LB67 conduit elbow; Davey McKee (McKee), the general contractor on the construction project at Granite City Steel; and the National Steel Corporation (National), d/b/a Granite City Steel, the owner of the premises where plaintiff's injury occurred. Plaintiff's suit against Crouse-Hinds was based upon strict tort liability. Specifically, plaintiff alleged that the LB67 conduit elbow was unreasonably dangerous and defective because of a manufacturing defect. Plaintiff's suits against McKee and National were based upon violations of the Structural Work Act (740 ILCS 150/0.01 *et seq.* (West 1994)). Crouse-Hinds counterclaimed against McKee and National, claiming violations of the Structural Work Act. Crouse-Hinds also filed a third-party action against Sachs, alleging violations of the Structural Work Act.

The following relevant evidence was adduced at trial. On September 14, 1990, at approximately 3:30 p.m., plaintiff was working on the outside of a Granite City Steel casting building running a 10-foot piece of conduit pipe weighing about 35 pounds from an inside junction box to a crane power junction box which was on the top of the building, approximately 30 to 35 feet from the ground. Plaintiff testified that he was on a ladder attempting to tighten the conduit pipe by turning it into a Crouse-Hinds LB67 conduit elbow. According to plaintiff, he was trying to get another three-quarters of a turn on the conduit pipe when the conduit elbow exploded and threw him off the ladder, causing him to land on his heels. Plaintiff estimated that he fell a distance of between four and five feet. Plaintiff testified that he was unable to stand up because of the pain in his ankles. Although plaintiff asked his foreman to save the conduit elbow, it was not preserved. However, Larry Anderson, a safety man working on the construction job, took two Polaroid pictures of the broken conduit elbow (plaintiff's exhibits five and six). One photograph (plaintiff's exhibit five) depicts a portion of the fractured LB67 conduit elbow attached to the 10-foot section of conduit pipe that plaintiff had been installing, which had fallen to the ground. The second photograph (plaintiff's exhibit six) depicts a portion of the fractured LB67 conduit elbow attached to a section of conduit pipe coming out of the wall of the casting building.

Dr. Albert Karvelis, a vice-president with Packer Engineering, was Crouse-Hinds' expert. He opined that the fracture of the LB67 conduit elbow was "the direct result of a sudden application of a levering or bending force." Dr. Karvelis further opined that plaintiff fell, grabbed the conduit pipe, and broke it with his weight. Dr. Karvelis based his opinion on his examination of the two photographs that depict the fractured LB67, the documents generated in the case, measurements he made at the situs of the accident, and some laboratory tests "for demonstrative purposes."

Shortly after Dr. Karvelis' revelation about laboratory tests, a conference was held outside the presence of the jury during which it was discovered that Crouse-Hinds had failed to disclose the existence of certain laboratory tests involving three LB67s. As a result, the trial judge struck Dr. Karvelis' testimony, prevented Dr. Karvelis from testifying any further in the case, and instructed the jury to disregard all of Dr. Karvelis' testimony.

The case then went to the jury, which rendered the following verdict in favor of plaintiff and against Crouse-Hinds:

| | |
|---|---:|
| past and future lost wages | $1,880,000 |
| past and future medical expenses | $ 600,000 |
| past and future pain and suffering | $ 260,000 |
| disability and disfigurement | $ 260,000 |
| total | $3,000,000. |

The jury found Crouse-Hinds to be 100% at fault, National 0% at fault, and McKee 0% at fault. The jury also found in favor of National and McKee on Crouse-Hinds' counterclaim against them and in favor of Sachs on Crouse-Hinds' third-party complaint. On March 28, 1994, the trial court entered judgment on the verdict. On April 26, 1994, Crouse-Hinds filed a post-trial motion. On May 19, 1994, the trial court denied the post-trial motion but granted Crouse-Hinds a $300,000 remittitur in the award of past and future medical expenses.

Crouse-Hinds raises the following issues on appeal: (1) whether the trial court abused its discretion in striking the trial testimony of Dr. Karvelis, excluding him as a witness, and giving a jury instruction as to why Dr. Karvelis' testimony was stricken; (2) whether the refusal to give a *Tweedy* instruction was reversible error (see *Tweedy v. Wright Ford Sales, Inc.* (1976), 64 Ill. 2d 570, 357 N.E.2d 449); (3) whether the jury's award of past and future medical expenses is excessive and not supported by the evidence; and (4) whether the jury's award of past and future lost wages is excessive and not supported by the evidence.

The first issue raised by Crouse-Hinds concerns the sanctions imposed upon it for failing to timely disclose the existence of Dr. Karvelis' lab tests involving three LB67s. Crouse-Hinds argues that it did not violate Supreme Court Rule 220(c)(1) (134 Ill. 2d R. 220(c)(1)) because the tests conducted by Dr. Karvelis were "for the demonstrative purpose of illustrating a scientific principle, and did not serve as a basis for his opinion." Furthermore, Crouse-Hinds argues that even if Rule 220 required disclosure, it made a "more than adequate disclosure." Alternatively, Crouse-Hinds argues that even if it did violate Rule 220, the sanctions imposed were too harsh.

At the outset, we wish to address the issue of whether the three LB67s that Dr. Karvelis broke in his lab were demonstrative exhibits or tests that formed a basis for his opinions. In support of its position that the three broken LB67s were demonstrative exhibits not required to be disclosed under Rule 220, Crouse-Hinds cites *Foster v. Devilbiss Co.* (1988), 174 Ill. App. 3d 359, 529 N.E.2d 581. In *Foster*, plaintiff brought a products liability suit against the Devilbiss Company, manufacturer of the airless spray paint gun involved in

plaintiff's injury. The jury returned a verdict in favor of plaintiff, and defendant appealed. Defendant argued on appeal that the trial court erred in allowing plaintiff's expert and then his attorney to bend a spray-paint-gun trigger guard in front of the jury because "[e]xperiments must be substantially similar to the actual conditions of the case." (*Foster*, 174 Ill. App. 3d at 365, 529 N.E.2d at 585.) The appellate court rejected defendant's argument, holding:

> "Devilbiss has confused the use of demonstrative exhibits with experiments carried out by experts to form an opinion. Experiments must be substantially similar to the actual conditions of the case, pursuant to Supreme Court Rule 220 [citation], but Rule 220 is inapplicable to the use of a demonstrative exhibit." *Foster*, 174 Ill. App. 3d at 365, 529 N.E.2d at 585.

*Foster* is inapplicable to the instant case and does nothing to advance Crouse-Hinds' position. The case at bar does not involve an issue of an in-court demonstration. Crouse-Hinds' assertion that Dr. Karvelis' lab tests did not serve as a basis for his "levered to fracture theory" (*i.e.*, that plaintiff fell, grabbed the conduit pipe, and broke the conduit elbow with his weight) is belied by the record. Counsel for Crouse-Hinds and Dr. Karvelis engaged in the following colloquy on direct examination:

> "Q. And this opinion that you've given us, Doctor, *what have you based your opinion on?*
>
> A. I have studied the two photographs *** of the subject fractured fitting, I have studied all of the documents *** in this case, I have visited the site *** in Granite City where the accident occurred and made measurements as to the heights and lengths and distances, *and I've done some laboratory tests for demonstrative purposes.*" (Emphasis added.)

The fact that Dr. Karvelis characterizes his tests as "for demonstrative purposes" does not negate the fact that, when asked to state the basis for his opinion, Dr. Karvelis listed his lab tests as being a supporting basis of his levered to fracture theory. Lest there be any doubt in this regard, we note this exchange between counsel for Crouse-Hinds and Dr. Karvelis:

> "Q. All right. *Now, Doctor, you've also said that you've done some testing that supports your opinion.* When was that done?
>
> A. That was done in the fall of '93.
>
> Q. And where did the testing take place?
>
> A. At Packer Engineering.
>
> * * *
>
> Q. Can you be more specific concerning the date of the testing? ***
>
> * * *

A. This testing was done July 13th, '93." (Emphasis added.)

There is nothing equivocal or unclear about the questions asked of Dr. Karvelis or the answers given. We are unpersuaded by Crouse-Hinds' attempt to camouflage Dr. Karvelis' lab tests as demonstrative exhibits. Based upon our review of the record, we conclude that Dr. Karvelis' lab tests formed a supporting basis of his levered to fracture theory.

We now turn to Crouse-Hinds' contention that it made a "more than adequate disclosure." Again, the facts show otherwise. On August 16, 1993, Crouse-Hinds filed its answers to expert interrogatories. In its answers, Crouse-Hinds disclosed Dr. Karvelis as its expert but made no mention of any lab tests involving LB67s. The purported basis for Dr. Karvelis' opinion was his reliance on:

"[T]he prints of the three Polaroid photographs of fitting and ladder, Plaintiff's First Amended Complaint, Plaintiff's Answers to Interrogatories of Glasco, Crouse-Hinds Flexure Test Report No. ME 2432 and the depositions of Don Thomas, Garrett Yarbrough, Francis J. Kelly *** and Stan Shaffer.

Examination of an exemplar Crouse-Hinds LB fitting, a physical examination and measurements involving use of an 8 foot and a 10 foot ladder of the accident site and his experience, training and education."

The discovery deposition of Dr. Karvelis was taken on September 15, 1993. Dr. Karvelis was asked this question:

"Q. I was looking at your opinions that were given to us in Answers to Interrogatories, and I don't know whether you have seen this. But it says, 'The subject condulet could break as a result of excessive loads placed on it at the time of its fracture as a result of Mr. Thomas' loss of balance and applying his 190-pound weight to the conduit, thereby transferring the weight to the condulet.' *By that opinion, are you saying that you believe that he fell and then his weight broke the conduit? Is that what you mean by that opinion?*" (Emphasis added.)

Dr. Karvelis responded by stating, "That is a fair characterization."

The very next question asked of Dr. Karvelis was:

"Q. What are you basing that theory on? Mr. Thomas testified a piece broke and then he fell. You are saying he fell and a piece broke. I am asking you what you are basing that opinion on."

Dr. Karvelis gave this answer:

"A. It is based on a number of things besides the experience and the training and the study of how he was—my study of his deposition of his use of the particular wrench, and my knowledge of how conduits are threaded into fittings, and that from his description, the torque he was applying just would simply not be sufficient to

overcome an LB fitting. And yet, if I assume that there was in fact a broken fitting with those photographs, it had to come about in some way, and one way that one can break an LB fitting is to lose one's balance on the ladder and grab hold of it, and now you have 200 pounds at seven, eight feet, and that is certainly capable of fracturing something which is not a structural component."

Although specifically asked to state the basis for his levered to fracture theory, Dr. Karvelis was silent as to the existence of the lab tests that he performed involving the three LB67s.

Crouse-Hinds contends that photographs of the LB67 tests had been "produced" at Dr. Karvelis' September 15, 1993, deposition, and thus plaintiff was aware of the tests prior to trial. This argument is disingenuous. At Dr. Karvelis' deposition, Karvelis had a notebook binder which contained four photographs depicting the LB67 tests. These photographs were in a binder along with what can accurately be described as a lot of irrelevant materials. Even if plaintiff's counsel had looked through the entire binder at some point during the deposition, there is nothing, on the face of the photographs, that would have alerted him as to their significance as a supporting basis of Dr. Karvelis' levered to fracture theory. This is especially true given that prior to and during the deposition, Crouse-Hinds had not disclosed the existence of the LB67 tests.

Merely sandwiching photographs of the LB67 tests into a notebook binder, without having previously disclosed that the tests formed a basis of Dr. Karvelis' levered to fracture theory, does not satisfy the duty to disclose under Rule 220. We find it interesting that Crouse-Hinds did not bring any of the broken LB67 exemplars to the deposition, although they did bring them to trial. We can only conclude that this was done so as to further conceal the existence of the LB67 tests. Had the exemplars been present at the deposition, plaintiff's counsel might have been tipped off about the LB67 tests.

Crouse-Hinds next posits that plaintiff knew about the LB67 tests prior to trial because it had sent plaintiff copies of the materials contained in Dr. Karvelis' notebook binder. On September 22, 1993, Crouse-Hinds sent plaintiff's counsel the following items from Karvelis' notebook binder:

1. a five-page summary of plaintiff's deposition taken February 10, 1992;

2. a photocopy of a photograph depicting what appears to be some pipes;

3. three photocopied photographs of a man standing on a ladder;

4. three photocopied photographs of a ruler;

5. three pages containing Crouse-Hinds' "engineering standards" and "material specifications";

6. a copy of Illinois Pattern Jury Instructions, Civil, No. 1.03 (3d ed. 1989) (the circumstantial evidence instruction);

7. five pages from Crouse-Hinds' product catalog;

8. four pages showing human-shaped figures standing on ladders;

9. a two-page summary of plaintiff's injury;

10. three poorly photocopied photographs depicting some kind of machine or machines (the images in two of the photocopied photographs are not at all evident);

11. four pages of "construction specifications" from the 1993 National Electrical Code Handbook;

12. six pages from the 1977 "American National Standard Specification for Rigid Steel Conduit, Zinc Coated";

13. six pages on the safety requirements for ladders from "American National Standard"; and

14. an additional 27 pages of various documents.

There is nothing in the materials sent to plaintiff's counsel that would inform him that the LB67 tests formed a basis of Dr. Karvelis' levered to fracture theory. In fact, there is even less reason to believe anyone would have determined the significance of the LB67 test photographs given that plaintiff's counsel was sent poor quality photocopies of the LB67 test photographs. The images in two of the photocopied photographs are not at all discernible. It is not possible to look at the photocopied photographs and conclude that the LB67 tests formed a basis of Dr. Karvelis' levered to fracture theory.

Crouse-Hinds did not satisfy Rule 220 by simply sending plaintiff's counsel poorly photocopied photographs of the LB67 tests. All Crouse-Hinds had to do to satisfy Rule 220 was to inform plaintiff that Dr. Karvelis had conducted lab tests involving LB67s and that these tests supported his levered to fracture theory. Crouse-Hinds chose not to do so and in the process violated Rule 220.

Crouse-Hinds further posits that plaintiff knew about the LB67 tests prior to trial because plaintiff's expert, H. Boulter Kelsey, commented about the tests at his December 28, 1993, discovery deposition. Crouse-Hinds points to the following portion of Kelsey's deposition as proof that plaintiff, via Kelsey, knew about the LB67 tests:

"Q. You are referring to [Dr. Karvelis'] photographs of the fracturing, intentional fracturing under test conditions of the particular fitting?

A. Sure, absolutely. But you know, he has done a lot of things here and he's got all kinds of interesting materials, but they don't really form a basis for my opinion at all.

Q. Okay.

A. I think in fact they tend to show what didn't happen.

Q. Okay. I don't want to belabor that, but I am just kind of curious what you are alluding to there.

A. What didn't happen?

Q. Yes.

A. *** The fracture that he generates is interesting, by dropping as you have it in this one exhibit, dropped one hundred pounds on a *** LB fitting, and shows that it breaks in the same area where the Polaroids show this one to be broke ***. It doesn't surprise me a bit. It also shows that it is a brittle fracture. Unfortunately, he does not support the LB fitting in the same manner that this one was at the time of the accident, because he is not hanging it out on long runs of tube, or pipe, which would have subsequently bent ***. So though it is a nice academic demonstration, I don't think it necessarily demonstrates the way this particular accident occurred. ***."

The flaw in Crouse-Hinds' reasoning is that while Kelsey was aware of the *existence* of the previously undisclosed LB67 tests at his December 28, 1993, deposition, Crouse-Hinds did not disclose to plaintiff that the LB67 tests formed a *basis* of Dr. Karvelis' levered to fracture theory. Thus, even assuming that notice to an expert constitutes notice to a party and that plaintiff could be said to have known about the existence of the LB67 tests by December 28, 1993, the plaintiff did not know that the tests formed a basis of Dr. Karvelis' levered to fracture theory until trial. Supreme Court Rule 220(c)(1)(ii) (134 Ill. 2d R. 220(c)(1)(ii)) explicitly requires a party retaining or employing an expert to disclose that expert's conclusions, opinions, and "bases therefor."

Crouse-Hinds concealed the existence of the LB67 tests at the time it filed its answers to expert interrogatories on August 16, 1993, at the time Dr. Karvelis was deposed on September 15, 1993, and on September 22, 1993, when Crouse-Hinds sent plaintiff's counsel, among many irrelevant materials from Dr. Karvelis' notebook binder, some poorly photocopied photographs of the LB67 tests. Finally, plaintiff's expert became aware of the existence of the LB67 tests at his December 28, 1993, deposition. However, Crouse-Hinds waited until trial to reveal that its LB67 tests supported Dr. Karvelis levered to fracture theory. This is a Rule 220 violation.

On January 18, 1994, Crouse-Hinds filed its supplemental answers to plaintiff's Rule 220 interrogatories. In subsection (c)(1) of its supplemental interrogatories, Crouse-Hinds states that Dr. Karvelis' levered to fracture theory is:

"based upon and/or supported by: review of Boulter Kelsey's December 28, 1993 deposition; review of Don Thomas' December 23, 1993 deposition; review of Stan Shaffer's December 23, 1993

deposition; review and analysis of the original poloroid [*sic*] photographs taken at the scene of the accident; *re-review of his own test results*; Boulter Kelsey's 12/28/93 deposition testimony that if the LB fitting was fractured with a levering action that [*sic*] he would expect it to fail in much the location that it failed; the original discovery depositions of Shaffer and plaintiff; and his experience, training and education." (Emphasis added.)

Once again, there is no mention of the lab tests involving the three LB67s. We do not know what Crouse-Hinds intended to convey by its vague reference to a "re-review of [Dr. Karvelis'] own test results." No explanation is given as to what tests Dr. Karvelis had re-reviewed. Because the only test results Crouse-Hinds previously disclosed concerned the physical examination and the measurements that Dr. Karvelis took at the accident scene, it is reasonable to conclude that a re-review of test results meant only that Dr. Karvelis reviewed his test results from the accident scene. There is nothing in Crouse-Hinds' supplemental disclosure that would alert anyone that the previously undisclosed lab tests involving the three LB67s supported Dr. Karvelis' levered to fracture theory. Saying that Dr. Karvelis made a "re-review of his own test results" does not satisfy Crouse-Hinds' duty to disclose under Rule 220. To suggest otherwise, as does Crouse-Hinds, strains credulity.

The first time the LB67 tests were revealed as a supporting basis of Dr. Karvelis' levered to fracture theory was at trial. When asked to state the basis for his levered to fracture theory, Dr. Karvelis testified:

"I have studied the two photographs *** of the subject fractured fitting, I have studied all of the documents *** in this case, I have visited the site *** in Granite City where the accident occurred and made measurements as to the heights and lengths and distances, *and I've done some laboratory tests for demonstrative purposes.*" (Emphasis added.)

■ Having closely reviewed the record and the arguments of the parties, it is apparent that Crouse-Hinds did not timely disclose the LB67 tests as a supporting basis of Dr. Karvelis' levered to fracture theory prior to trial as it was required to do under Rule 220. It appears to this court that Crouse-Hinds attempted to conceal the LB67 tests from the other parties. We have previously held that "[w]hether omissions in discovery are intentional or inadvertent, this court will neither condone nor tolerate false, incomplete, or inaccurate discovery." *Boettcher v. Fournie Farms, Inc.* (1993), 243 Ill. App. 3d 940, 948, 612 N.E.2d 969, 974-75.

■ The final Rule 220 issue raised by Crouse-Hinds relates to the

severity of the sanctions imposed by the trial court. Crouse-Hinds argues that the trial court's sanction was too harsh. We disagree. The imposition of sanctions for failure to comply with discovery rules lies within the sound discretion of the trial court. (*Sohaey v. Van Cura* (1994), 158 Ill. 2d 375, 381, 634 N.E.2d 707, 709; *In re Marriage of Frey* (1994), 258 Ill. App. 3d 442, 452, 630 N.E.2d 466, 474; *Delvecchio v. General Motors Corp.* (1993), 255 Ill. App. 3d 189, 193-94, 625 N.E.2d 1022, 1025.) A trial court is vested with broad discretion, and its decision will not be disturbed on appeal unless it appears to have been clearly abused. (*Frey*, 258 Ill. App. 3d at 452, 630 N.E.2d at 474; *Delvecchio*, 255 Ill. App. 3d at 194, 625 N.E.2d at 1025.) In determining whether to allow or exclude expert testimony because of a discovery rule violation, the trial court may consider the following factors: (1) surprise to the adverse party; (2) the prejudicial effect of the testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timely objection to the testimony; and (6) the good faith of the party calling the witness. *Barth v. Reagan* (1990), 139 Ill. 2d 399, 420-21, 564 N.E.2d 1196, 1206; *Huelsmann v. Berkowitz* (1991), 210 Ill. App. 3d 806, 810, 568 N.E.2d 1373, 1376.

The first factor we look at is the element of surprise to the adverse party. This factor is easily satisfied in the case at bar given that plaintiff and the other parties did not learn about the existence of the LB67 tests as a supporting basis of Dr. Karvelis' levered to fracture theory until trial.

> "Without knowledge of the general factual opinion held by the expert, opposing counsel is precluded from adequately preparing for his examination of the expert." *Huelsmann*, 210 Ill. App. 3d at 810, 568 N.E.2d at 1376.

The second factor we look at is the prejudicial effect of the testimony. By failing to disclose the existence of the LB67 tests and by failing to produce the three broken LB67 exemplars prior to trial, Crouse-Hinds deprived the parties of any opportunity to examine the broken LB67 exemplars, compare the appearance of the fractures of the broken LB67 exemplars with the photographs of the LB67 involved in plaintiff's injury, or perform like testing of their own. As a result of Crouse-Hinds' failure to disclose the LB67 tests prior to trial, plaintiff and the other parties were precluded from developing any meaningful cross-examination of Dr. Karvelis. Thus, the prejudicial effect of Crouse-Hinds' nondisclosure is high.

The third factor we look at is the nature of the testimony. As we have previously stated, Dr. Karvelis' LB67 tests were not mere demonstrative exhibits but, rather, were lab tests that formed a basis for his levered to fracture theory. In addition to those portions of the

record previously quoted in this order, we note the following exchange between counsel for McKee and Dr. Karvelis that occurred during the *voir dire* of Dr. Karvelis outside the presence of the jury:

"Q. The box is marked, excuse me. The box which has the fitting—broken fitting that came out of Plaintiff's Exhibit F, that's one of the [LB67s] you broke in your tests?

A. Yes, sir.

Q. And it's your opinion that the break here looks like the break that's shown *** in Plaintiff's Exhibit 6-A?

A. Yes, sir.

\* \* \*

Q. Isn't that one of the bases for your opinions, then, the way this one looks that came out of the box marked Plaintiff's Exhibit F?

A. *That's proof that my test is accurate with respect to how things break under certain laboratory loads.*" (Emphasis added.)

The fourth factor we look at is the diligence of the adverse party. Plaintiff propounded Rule 220 interrogatories to Crouse-Hinds and took a discovery deposition of Dr. Karvelis. A party retaining or employing an expert witness is required to state the subject matter on which the expert is expected to testify and his conclusions, opinions, and bases therefor. (134 Ill. 2d R. 220(c)(1).) Plaintiff acted with diligence in attempting to ascertain Dr. Karvelis' opinions and bases thereof.

The fifth factor we look at is the timeliness of the objection to the testimony. There is no question that counsel for plaintiff made a timely objection to Dr. Karvelis' trial testimony about the LB67 tests.

The sixth and final factor we look at is the good faith of the party calling the witness. We can see no good faith on the part of Crouse-Hinds in not timely disclosing the LB67 tests as a supporting basis of Dr. Karvelis' levered to fracture theory.

Having carefully considered the various *Barth* factors, all of which strongly militate in favor of plaintiff, we conclude that the trial court did not abuse its discretion when it struck Dr. Karvelis' testimony, barred him from testifying any further in the case, and gave a jury instruction explaining the reason why Dr. Karvelis' testimony was stricken. A trial court abuses its discretion when it either acts arbitrarily without the employment of conscientious judgment or its decision exceeds the bounds of reason and ignores principles of law such that substantial prejudice has resulted. (*Venzor v. Carmen's Pizza Corp.* (1992), 235 Ill. App. 3d 1053, 1059, 602 N.E.2d 81, 85; *Zurich Insurance Co. v. Raymark Industries, Inc.* (1991), 213 Ill. App. 3d 591, 595, 572 N.E.2d 1119, 1122.) Given the serious-

ness and the prejudicial impact of Crouse-Hinds' Rule 220 violation, we cannot say that the trial court acted arbitrarily or that its decision exceeded the bounds of reason. Consequently, the sanctions imposed upon Crouse-Hinds were not an abuse of the trial court's discretion.

For the aforementioned reasons, we hereby affirm the judgment of the circuit court of Madison County.

Affirmed.

MAAG, P.J., and CHAPMAN, J., concur.