2025 IL App (2d) 240745-U
No. 2-24-0745
Order filed October 2, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| YIU YEUNG CHOY, | ) | Appeal from the Circuit Court |
| | ) | of De Kalb County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 21-L-31 |
| | ) | |
| DAMIEN P. HART, | ) | Honorable |
| | ) | Bradley J. Waller, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Birkett and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   On appeal from a jury verdict in favor of plaintiff for injuries he sustained when the Prius in which he was a backseat passenger was rear-ended by defendant's Focus, the trial court did not err (1) in permitting the Prius' driver to testify that she felt a "slight jerk" upon impact, as that testimony was consistent with the trial court's pretrial ruling and was not an improper expert opinion on the force of the impact; (2) in refusing to preemptively instruct the Prius' driver not to testify to photographs she had taken of the Prius after the impact (which photographs had been ruled inadmissible because of a discovery violation), where defense counsel had assured the court that he would not ask the driver about the photographs; or (3) in denying plaintiff's motion for a new trial on damages based on defendant's failure to timely disclose the photographs, where damage to the Prius was already established at trial and considered by plaintiff's expert witness in testifying that plaintiff suffered traumatic brain injury from the collision. Finally, since the record on appeal is incomplete, plaintiff cannot establish prejudice from any of the alleged errors.

¶ 2       Plaintiff, Yiu Yeung Choy, brought a negligence action against defendant, Damien P. Hart, for injuries sustained in a relatively minor automobile accident that occurred on February 28, 2020, while plaintiff was a backseat passenger in a rideshare vehicle driven by Candace Hudson. Defendant's vehicle—a Ford Fusion—rear-ended Hudson's vehicle—a Toyota Prius—as Hudson was preparing to turn right at an intersection. Defendant conceded partial summary judgment on the issues of duty and breach, and the matter proceeded to a jury trial on causation and damages. At trial, plaintiff sought $12.8 million, claiming he sustained a permanent traumatic brain injury. The jury found in favor of plaintiff and awarded him $20,000 in damages. Plaintiff filed a motion for a new trial on damages, which the trial court denied. Plaintiff timely appealed. On appeal, plaintiff argues that the trial court abused its discretion by (1) allowing Hudson to testify that she felt "[a] slight jerk" at the time of the accident; (2) refusing to preemptively instruct Hudson to refrain from testifying to any photographs she had taken of her Prius, where the court had previously ruled that the photographs were inadmissible due to defendant's failure to timely disclose them; and (3) denying plaintiff's motion for a new trial based on defendant's failure to timely disclose the Prius photographs. For the reasons that follow, we affirm.

¶ 3                              I. BACKGROUND[1]

_____

[1]The record on appeal consists of (1) the common law record, (2) a report of proceedings, (3) a supplemental report of proceedings, (4) a second supplemental report of proceedings, and (5) the trial exhibits.

In violation of Illinois Supreme Court Rule 342(3) (eff. Oct. 1, 2019), plaintiff has failed to include in his appendix "a complete table of contents" to the record on appeal, including "the names of all witnesses and the pages on which their direct examination, cross examination, and redirect examination begin." This

¶ 4                              A. Motions *in Limine*

¶ 5     Before trial, plaintiff filed 31 motions *in limine*. Motion *in limine* No. 16 asked the trial court to preclude defendant "from presenting any opinion witnesses and their testimony, whether pertaining to factual matters or opinions, concerning matters beyond their alleged expertise." Motion *in limine* No. 31 asked the court "to bar any discussion of lack of injury to other occupants, property, or vehicles involved in the crash," because any such evidence was "irrelevant and unduly prejudicial."

¶ 6     On January 19, 2024, the trial court heard argument on plaintiff's motions *in limine*. The record does not contain a report of these proceedings. The preprinted order, signed by the court, reflects (by checkmark) that motion *in limine* No. 16 was "RESERVED" and No. 31 was "GRANTED." The following was handwritten below the printed text and above the court's signature:

> "Competent witness lay the foundation of photographs of vehicles post crash to show their condition, but not talk about minor crash or impact.
>
> Uber driver can testify about what happened but not injuries or forces."

¶ 7                              B. Jury Trial

---

failure has made it exceedingly difficult for us to navigate the record. It is especially problematic because the reports of proceedings are not assembled in any manner of order, nor are they properly identified with the correct proceeding date. We admonish counsel to comply with the supreme court rules in future briefs filed with this court.

    We note, too, that plaintiff has failed to provide us with a complete record of the trial proceedings. This failing will be addressed more fully below.

¶ 8    The matter proceeded to a jury trial, which took place over five days. The record reflects that plaintiff presented testimony from five witnesses: (1) Dr. Ammar Chaudry (via video deposition), (2) Dr. Mariusz Ziejewski, (3) Dr. Bradley Sewick (via video deposition), (4) Dr. Michael Rabin, and (5) plaintiff. In addition, plaintiff offered numerous exhibits that were admitted into evidence. Defendant presented testimony from four witnesses: (1) Dr. Rizwan Bajwa, (2) Hudson, (3) defendant, and (4) police officer John Loechel. One exhibit offered by defendant was admitted into evidence.

¶ 9    Even though nine witnesses testified, the record includes testimony from only four witnesses: (1) Ziejewski, one of plaintiff's four experts; (2) plaintiff; (3) Bajwa, defendant's sole expert; and (4) Hudson. The record also includes each counsel's opening statements, but only defense counsel's closing argument. In addition, the record includes the parties' discussions with the trial court regarding (1) defendant's untimely disclosure of the Prius photographs; (2) whether Hudson should be instructed not to reference the Prius photographs; and (3) whether plaintiff could ask Hudson what she felt upon impact. The latter two discussions occurred before Hudson's testimony, and the former took place after oral arguments.

¶ 10   We now set forth the relevant trial proceedings that are included in the record on appeal.

¶ 11                              1. Opening Statements

¶ 12   We briefly set forth counsel's opening statements to aid in understanding the parties' positions at trial and to put plaintiff's contentions on appeal in the proper context.

¶ 13                              a. Plaintiff's Counsel

¶ 14   Plaintiff's counsel told the jury that the case involved a rear-end collision and suggested that, generally, the "issue is whether or not the traumatic brain injury that [plaintiff] suffered from the car crash is permanent or it resolved." Counsel indicated that his expert—Ziejewski—would

testify about the biomechanics of the crash and how "the amount of force on [plaintiff's] brain" caused a traumatic brain injury due to his "positioning in the car," *i.e.*, "he was about 9 inches leaning forward, talking to [Hudson]." Counsel told the jury that, among other things, they were "going to hear from neuroradiologists, neurosurgeons, neuropsychs who are all going to talk about permanency of the brain injury suffered, and we're actually going to show you what's called an MRI DTI imaging that actually shows you objectively the damage to the brain." Counsel stated that "the defense expert is going to diagnose [plaintiff] with adjustment complex disorder as a result of this crash, a fancy way of saying emotional distress." Counsel showed the jury a photograph of the Fusion and commented: "There's no pictures of the Prius because [Hudson] left." He stated further: "We know the police report documents some damage to the white Prius. How much, no one knows, (unintelligible) an inspection."

¶ 15                                  b. Defense Counsel

¶ 16    Defense counsel stated that the jury would "see the photographs of the Toyota Prius" and that the photographs would show "that there's no impact at all." He stated that police were not called to the scene and that he would be presenting testimony from a police officer—Loechel—who prepared a report after the fact and would testify regarding his report. The remainder of counsel's opening statement focused primarily on plaintiff's medical treatment. Counsel noted that the undisputed medical records showed that plaintiff went to the emergency room a few days after the accident with right knee pain and a headache, but that tests showed no hematomas, edema, or fractures. Additionally, a CT scan of plaintiff's neck revealed no abnormalities. Plaintiff then saw his primary care physician—Dr. Ulstrup—about four times over the next few months. Ulstrup diagnosed plaintiff with a concussion and recommended "brain rest." Counsel emphasized that the medical records showed improvement and that plaintiff was set to return to work on April 20,

2020. Plaintiff then saw a neurologist—Dr. He—who did various tests on plaintiff and recommended an MRI scan for him. Dr. He advised plaintiff that his neurological exam and MRI scan were normal. Dr. He attributed plaintiff's lack of concentration to his cessation of Adderall prescribed for ADHD. Dr. He also prescribed steroids and recommended bloodwork. Plaintiff did not follow either recommendation or return to either treating physician. Instead, a year and a half later, after filing a lawsuit, plaintiff saw a different doctor—Sewick—who conducted a neuropsychological exam. Counsel stated that Sewick would testify that all of plaintiff's issues were caused by the accident. Counsel noted that Sewick relied heavily on plaintiff's own descriptions of his life before and after the accident. Counsel noted that additional experts—Chaudry and Rabin—would testify for plaintiff. Counsel emphasized that Chaudry would concede that he could not say whether the accident caused plaintiff's symptoms. And while Rabin would testify to a "litany of future costs" attributable to the accident, he, too, relied only on plaintiff's statements about how he felt before and after the accident. Counsel stated that his expert—Bajwa—would testify that plaintiff did suffer a concussion due to the accident, but that the "medical consensus" was that symptoms from this type of concussion last between three and six months. Furthermore, Bajwa would testify that, if plaintiff had suffered the type of injury that would lead to the lifelong symptoms alleged here, the initial CT and MRI scans would have revealed a more serious injury.

¶ 17     2. Discussion and Sanctions Regarding Failure to Disclose Prius Photographs

¶ 18     Following opening statements, plaintiff's counsel informed the trial court outside the presence of the jury that, although he had requested all vehicle photographs in discovery, defendant never produced any Prius photographs. Defense counsel responded that he believed that the Prius photographs had been disclosed. The court granted a recess so that counsel could investigate. Upon

reconvening, defense counsel stated that he received the photographs in August 2022, nine months after Hudson's deposition, and that he had forwarded them to plaintiff's counsel. As it turned out, plaintiff's counsel did not receive the photographs until the Friday before trial, as part of defendant's anticipated trial exhibits. Plaintiff's counsel argued that the disclosure was untimely. The court agreed and barred the photographs.

¶ 19                    3. Relevant Trial Testimony Contained in the Record

¶ 20                          a. Testimony from Plaintiff's Case

¶ 21                              i. Dr. Ziejewski's Testimony

¶ 22    Ziejewski testified that he was a university professor who "conduct[ed] research on mild traumatic brain injury in conjunction with [his] appointment as a professor and work with the Department of Defense." He testified that he was

> "asked to evaluate the event that took place, two collision—that two vehicles were involved
>
> in a collision, and we have a minor—we assume no damage to either of the vehicle, and
>
> perform the physics, a biomechanical analysis, and see if that event is consistent with what
>
> we see in the medical records, and what we see in the medical records are brain injuries."

Ziejewski reached two "overarching" conclusions in this case: (1) "as a result of the collision, the injury mechanism for traumatic brain injury was introduced" and (2) "the forces associated with th[e] collision or actually angular accelerations of the head were more than sufficient to cause mild traumatic brain injury, traumatic brain injury." Plaintiff's counsel asked: "What did you do to ultimately arrive at your conclusion that the forces were high enough in that car to cause a [mild traumatic brain injury]?" Ziejewski responded:

> "Well, obviously in review of the materials that were provided to me, I saw the
>
> police officer's report, I had a chance to review the deposition of [Hudson and defendant]

and [plaintiff's] deposition, look at the medical records. There's also a memorandum from [plaintiff] that I reviewed.

Then I looked at the photographs of the vehicles. The vehicles were not available for the inspection, but the photographs were for the Ford, that's the bullet.

In vehicle dynamics, very often we talk about target and bullet. The bullet is the vehicle that hits, and target obviously you've hit, so I will be using those terms on occasion. So I had the chance to review the photographs of the Ford, which was the bullet vehicle.

And then I reviewed—reviewed medical records, and I understand the general outcome in terms of the injuries.

I also requested [plaintiff] in the exemplar vehicle to show me how he was positioned.

Body position is critically important. For ejection for pilots, we have a very strict protocol, what kind of pre-load on the seatbelt, what the body, head, and neck position has to be, and we know from our own experience the body position can be directly connected to injury.

You can step off the curb one time in your life, and actually you can break your ankle. Something you've done for thousands of millions of times, one time if the foot is not positioned the right way, the internal forces can be in excess of the strength of the bone, which means that a relatively minor event like stepping off the curb that you do on a daily basis can lead to significant consequences, and I see this case to be just that."

When counsel asked Ziejewski to describe plaintiff's position in the vehicle at the time of the crash, Ziejewski responded, "[u]nusual, vulnerable." He testified that plaintiff's head was nine to

ten inches away from the front headrest at the time of the collision. Ziejewski "understood that [plaintiff] was talking to the driver."

¶ 23    Ziejewski was asked to explain the meaning of "diffuse brain injury." He stated that a diffuse brain injury is a "distributed injury" that is caused by "angular acceleration" and affects "a greater amount of brain tissue." He explained that "angular acceleration" is "[t]he acceleration of the head along an arc." Thereafter, the following colloquy took place regarding the rate of angular acceleration involved in this case:

"Q. [BY PLAINTIFF'S COUNSEL]: In [plaintiff's] case, were you able to quantify conservatively what that rate was?

A. Yes.

Q. What was that rate?

A. It was in excess of 3,400 radians, r-a-d, per second squared.

Q. And why is that a conservative number?

A. Because I did the analysis assuming no damage, zero damage. You look at the vehicle, you don't even know that the vehicles were involved in a collision.

That's not the case, there is some damage. So the—it would be higher than what I am showing.

Q. But 3,000, even assuming no damage is true, which we know it's not, this is a level sufficient to cause angular rotation brain damage?

A. Yes. That—this level, 2,000, 3,000, is 50 percent probability of traumatic brain injury.

Q. What's the highest radians squared for someone who suffers the most severe type of brain injury?

A. Well, 12,000 radians per second squared is essentially coma. Loss of consciousness, somewhere around 4,000 radians per second squared.

Q. Again, doctor, if there's damage to the vehicle, does that actually increase the radians squared?

A. That's correct.

Q. Does that increase the likelihood of a mild traumatic brain injury?

A. Yes, it does."

¶ 24 Ziejewski was shown a photograph of the Fusion and asked to describe the damage. He stated: "[Y]ou have to look at the hood right above the light and the front portion of the panels, and they are lifted. They are not in the same position left and right." Ziejewski also agreed that there was "damage documented in the police report to the Prius."

¶ 25 Ziejewski was asked, "[W]hy don't you need to see a demolished car in order for an occupant to suffer a traumatic brain injury?" He responded:

"You don't have to jump from a two-story building to end up with an ankle fracture. You can step off the curb. So[, an] event doesn't have to be this powerful, full of energy, as we imagine to end up with an injury. If you are in a vulnerable position, this can happen.

So[,] there's no direct relation between the severity of the vehicular collision and injury, and you know that, because if you have a collision with multiple occupants in a vehicle, is everybody injured the same way? No. Is everybody injured, first of all? Might not be. Maybe one person injured, other person is not. So obviously there's so many other factors like body position, awareness, and so on."

Ziejewski agreed that plaintiff's injuries, as documented in the medical records, were "consistent with injuries sustained where there's angular acceleration of at least 3,000 rad squared."

¶ 26     On cross-examination, defense counsel asked Ziejewski whether he had "seen any photograph or seen the actual car, the actual Prius involved in this case." Ziejewski agreed that he had not; he had used only an "exemplar Prius" for his calculations. He testified that he had asked for photographs of the Prius. He stated that, "based on the police officer's note, there's damage to the real Prius." Counsel also asked whether Ziejewski had asked to talk to Hudson or defendant. Ziejewski replied no, because he was "not a trained interviewer"—he "rel[ied] on the information [that was] confined in the records." He stated that he did not need to talk to Hudson or defendant because he had their depositions. Ziejewski also agreed that he did not speak with plaintiff. When counsel asked Ziejewski whether he had testified that "it's not relevant *** whether there's damage to the cars in this case," Ziejewski replied:

> "No, it is relevant, because damage to the car will tell you that collision was more severe than without the damage, but I performed the analysis at the point that [*sic*] just about damage to occur. So there's no damage, that's the assumption I used in my analysis. Obviously any damage would just simply make the numbers bigger."

¶ 27                              ii. Plaintiff's Testimony

¶ 28     Plaintiff was 28 years old at the time of trial. He testified that he was a backseat passenger in the Prius when it was struck from behind. The Prius was stopped at a light, waiting to turn right, when he felt the impact. Plaintiff "hit the back of [his] head on the back rest, and then [his] face was squished into the front seat, then [he] hit the back again." He was wearing a seat belt, but it did not tighten. At the time of the impact, he "was leaning forward trying to listen to [Hudson]." The vehicles stopped, and the police were called. He did not get any medical attention at the scene.

¶ 29     Plaintiff testified that he woke up the next day with a "pretty bad headache." He took ibuprofen, but over the next several days, his headache did not improve. He went to the emergency

room. On the way there, he felt dizzy and nauseated and was sensitive to light. After the ER visit, he scheduled other medical appointments. The recommendation he received was "brain rest." He followed that recommendation but continued to have symptoms. He had difficulty with balance. He could not coordinate his feet when driving his stick shift vehicle. The symptoms persisted for "months on end, especially light sensitivity." He could not watch TV, play video games, or read. At the time of the accident, he was attending Northern Illinois University, majoring in bioengineering. He dropped his classes because he could not maintain the minimum GPA and was at risk of losing future scholarship eligibility. He was unable to take his prescribed Adderall medication for ADHD because it worsened his headaches. He was also unable to continue working as a dental assistant because his hands were not stable. Nor could he continue working as a tutor because he could no longer express himself as he used to. He currently works as a consultant at an automobile repair shop. He has headaches two to three times per week and is irritable. He continues to suffer from light sensitivity and must limit his screen time. He uses a blue light filter on his computer.

¶ 30                              b. Defendant's Case

¶ 31                              i. Dr. Bajwa

¶ 32    Bajwa testified that he was a practicing neurologist and saw about 15 to 20 patients per day, including those involved in automobile accidents. He also taught a neurology class to second-year medical students at Midwestern University College of Medicine. He published articles and gave presentations in the field of neurology. In preparing his opinion in this case, Bajwa reviewed (1) plaintiff's medical records; (2) the police report; (3) photographs of the accident; (4) deposition testimonies, including that of Dr. He; and (5) a report prepared by Dr. Sewick. Bajwa provided

extensive testimony regarding his interpretation of plaintiff's medical history, medical records, CT and MRI results, and post-accident symptoms.

¶ 33    Ultimately, Bajwa testified that he disagreed with Sewick's conclusion that all of plaintiff's claimed symptoms resulted from the accident. Bajwa also noted that Sewick was not a medical doctor but, rather, had a "PhD in psychology and neuropsychology." In Bajwa's opinion, plaintiff suffered a concussion, with "typical immediate concussion symptoms." When asked when those symptoms would have been expected to resolve, he stated: "[I]n addition to my own experience as a physician, overwhelmingly in any literature review and our neurology expert opinions and journals, the majority of all minor concussion symptoms resolve within three to six months." When asked about the significance of plaintiff's normal MRI and CT scans, he stated:

> "[G]oing by my experience as someone who's been seeing patients for almost 18 years, patients who I've seen whose symptoms linger for years, for the rest of their life, the degree and the severity of the injury is such that it's very, very unlikely that all test imaging, including CT and MRI, are normal."

He testified further: "I've never in 18 years of practice seen someone with long-term disability from a similar scenario to this with a one-time mild concussion with this degree of injury." "[V]ery important" to Bajwa's assessment was the fact that plaintiff showed improvement in the first few months; Bajwa explained that "there's no scientific mechanism for which after getting better without any other concussion, *** to then take a decline months later, that just doesn't happen in practice. That's not the experience of anyone who treats patients long-term." Bajwa testified that "the most likely cause" for plaintiff's "current cognitive difficulties" was "adjustment disorder," which he explained is "the effect of anxiety and depression on [one's] ability to pay attention, to focus, to get through life, and to deal with other human beings." He noted that plaintiff's ADHD

was an "added difficulty" because plaintiff "already ha[d] a baseline difficulty with focusing and paying attention."

¶ 34                                    ii. Rulings on Hudson's Testimony

¶ 35    Before Hudson's testimony, plaintiff's counsel asked the trial court to ensure that Hudson was "prepped to not volunteer or go into that there were pictures taken [or] [that she has] seen pictures." Defense counsel stated that he was "not asking her about any pictures." The trial court then stated: "I'm not going to permit any sort of questions or answers regarding the characterization of the impact, minor, major, somewhere in between." The parties then discussed whether defense counsel could ask Hudson what she felt upon impact. The court stated that it did not "want [Hudson] to conclude that it was a minor impact or a major impact or somewhere in between." Thereafter, the following occurred:

> "THE COURT: You're going to lead her up to the point where you're going to say okay, where were you, you know, what happened, then what happened next, your classic direct questioning.
>
> MR. KHAN [(DEFENSE COUNSEL)]: All right.
>
> THE COURT: And what did you feel, if anything.
>
> MR. KHAN: If anything, yeah."

Immediately thereafter, plaintiff's counsel stated: "There's still the photographs, ***." Defense counsel stated, "Yeah, I'm not planning to use them. They've already been eliminated from this case because of the discovery problem." Counsel further assured that he had "no questions about the photos." He added: "So that should be enough." The trial court stated, "Yes, I agree."

¶ 36                                    iii. Hudson's Testimony

- 14 -

¶ 37    Hudson testified that she was an Uber driver. On February 28, 2020, plaintiff was a backseat passenger in Hudson's vehicle when it was rear-ended as Hudson was turning right. She had stopped before turning right, and her vehicle was slightly moving when it was rear-ended. Counsel asked: "What did you feel when the accident occurred, like immediately at that time?" Hudson responded: "A slight jerk." Plaintiff's counsel objected, and the trial court overruled the objection. When asked whether plaintiff was "leaning forward to talk to [her]" at the time of impact, she responded, "No, not to my knowledge." Hudson exited her vehicle and inspected it. When asked whether there was any damage, she replied, "Yes. It was like the imprint of the license plate on the back of the bumper, so you could see like the red imprint, ink." She could not recall whether she saw any "dents." Hudson had her car repaired; more specifically, "the back bumper *** had to get replaced." She explained: "The side of the bumper was sticking out." Hudson did not call the police, and she did not recall whether the police showed up at the scene. Plaintiff told her that he wanted her to report the accident to the police, and she told him no. She completed plaintiff's ride. He did not tell her that he was hurt, and she did not see him limping.

¶ 38    Counsel asked Hudson whether she was, at some point, suspended by Uber. The following colloquy ensued:

"A. Yes.

Q. And what did you do about that?

A. I had to stop driving and take pictures of the car and send it to Uber, but it was through the app.

Q. Okay.

MR. BRENNAN [(PLAINTIFF'S COUNSEL)]: Objection, move to strike any reference.

THE COURT: I will sustain that and also strike both the question and the answer."

Hudson testified that her suspension was lifted after "[a]bout a few hours."

¶ 39                              4. Defense Counsel's Closing Argument

¶ 40    In closing argument, defense counsel focused on the fact that plaintiff's treating physicians—Drs. Ulstrup and He—did not testify. Counsel argued that plaintiff did not follow Dr. He's recommendations or follow up with her. Much of counsel's argument challenged plaintiff's experts' testimonies. Counsel emphasized that the medical records showed that plaintiff suffered a concussion, that he was improving, and that his CT and MRI scans were normal. Counsel emphasized Bajwa's testimony that he had never seen anyone with similar MRI results show improvement and later, without further injury, become much worse and suffer permanent symptoms. He noted that Rabin, plaintiff's expert, agreed that the majority of people who have normal MRI results and show improvement do not suddenly worsen and develop permanent symptoms, absent further injury. Counsel argued that plaintiff was not a credible witness and challenged several aspects of his testimony.

¶ 41    On January 26, 2024, the jury entered a verdict in favor of plaintiff for $20,000.

¶ 42                              C. Posttrial Motion for a New Trial

¶ 43    Plaintiff filed a motion for a new trial on damages. Plaintiff argued, among other things, that a new trial was warranted because he was "materially prejudiced" by defendant's late disclosure of the Prius photographs. According to plaintiff, with the assistance of the photographs depicting damage to the Prius, Ziejewski would have been able to conclude that the angular rotation where plaintiff was seated exceeded the value Ziejewski testified to at trial.

¶ 44    Following a hearing, the trial court entered a written order denying plaintiff's motion for a new trial, "[f]or the reasons stated on the record." The record does not contain a transcript of that

hearing or an adequate substitute, such as a bystander's report or an agreed statement of facts. See Ill. S. Ct. R. 323(c), (d) (eff. July 1, 2017).

¶ 45    This timely appeal followed.

¶ 46                                II. ANALYSIS

¶ 47                        A. Ruling on Hudson's Testimony

¶ 48    Plaintiff first contends that the trial court abused its discretion by "reversing" its prior ruling and permitting Hudson "to testify that the force of the collision was 'slight.' " In response, defendant maintains that Hudson's testimony was not a characterization of the force of the impact but, rather, a subjective description of what she felt, and that the court's ruling at trial was consistent with its ruling on the motion *in limine*. Further, the State contends that, in any event, plaintiff has failed to establish that Hudson's testimony prejudiced him.

¶ 49    "Evidentiary rulings will not be reversed unless the 'error was substantially prejudicial and affected the outcome of trial.' " *Holland v. Schwan's Home Service, Inc.*, 2013 IL App (5th) 110560, ¶ 192 (quoting *Jackson v. Pellerano*, 210 Ill. App. 3d 464, 471 (1991)). Where an error does not affect the outcome of the case, or where the reviewing court can see from the entire record that no harm has been done, the judgment will not be reversed. *J.L. Simmons Co., Inc. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co.*, 108 Ill. 2d 106, 115 (1985). " 'The burden is on the party seeking reversal to establish prejudice.' " *Holland*, 2013 IL App (5th) 110560, ¶ 192 (quoting *Jackson*, 210 Ill. App. 3d at 471).

¶ 50    Plaintiff cites a single case to support his claim of error—*Keil v. McCormick*, 5 Ill. App. 3d 523 (1972). In *Keil*, the plaintiff sought to recover for injuries sustained when his vehicle was struck by a vehicle driven by the defendant. *Id.* at 524. At trial, defense counsel asserted in opening statements that the evidence would show that there had been no injuries to the defendant, the two

occupants of the defendant's vehicle, or the plaintiff's passenger. *Id.* at 525. The defendant was allowed to testify that neither she nor her passengers were injured. *Id.* The plaintiff presented medical bills totaling over $3,000. *Id.* at 524. Following a jury verdict in favor of the plaintiff for $253.50, the plaintiff appealed. *Id.* We held that the opening statement and evidence concerning lack of injury was error: "The issue involved was the injury to the plaintiff not the fact the defendant and her passengers, in a different automobile, were not injured." *Id.* at 526. Nevertheless, we affirmed the jury's verdict, finding that "the evidence of no injuries to others was not prejudicial to [the] plaintiff in this case." *Id.*

¶ 51    Relying on *Keil*, plaintiff argues that, if the lack of injury to the other driver and passengers is irrelevant, so too "are the forces felt by those people." However, defendant is correct that Hudson's testimony was not an improper characterization of the force of impact (or, as in *Keil*, improper testimony regarding the fact that she was not injured) but, rather, a description of what Hudson subjectively felt. As such, her testimony was not "based on scientific, technical, or other specialized knowledge." See Ill. R. Evid. 701 (eff. Jan. 1, 2011) (lay witness may not testify to opinion "based on scientific, technical, or other specialized knowledge within the scope of Rule 702"); see also Ill. R. Evid. 702 (eff. Jan. 1, 2011) ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."). Accordingly, the court did not abuse its discretion in allowing it.

¶ 52    In any event, even if Hudson's testimony was an improper characterization of the force of the collision as "slight," plaintiff has not established a basis for reversing the jury's verdict due to the admission of this single statement into evidence. Here, plaintiff suggests prejudice in that,

because Hudson testified *after* plaintiff's expert—Ziejewski—"[p]laintiff was unable to clean up or effectively rebut the prejudicial testimony admitted through [Hudson]." However, plaintiff fails to elaborate on how Ziejewski would have rebutted that testimony or the significance of his doing so. Indeed, Ziejewski had already made clear in his testimony that force did not necessarily correlate with injury. He stated:

"[T]here's no direct relation between the severity of the vehicular collision and injury, and you know that, because if you have a collision with multiple occupants in a vehicle, is everybody injured the same way? No. Is everybody injured, first of all? Might not be. Maybe one person injured, other person is not. So obviously there's so many other factors like body position, awareness, and so on."

Ziejewski emphasized plaintiff's "[u]nusual, vulnerable" body position at the time of the collision. "Body position is critically important." Using the example of stepping off a curb, he explained that "if the foot is not positioned the right way *** relatively minor event like stepping off the curb *** can lead to significant consequences." He stated further: "I see this case to be just that." Thus, the jury was already aware of Ziejewski's opinion that even "slight" force can result in "significant" consequences given an individual's "[b]ody position."

¶ 53    Moreover, we note that plaintiff does not argue that the trial court's alleged erroneous ruling affected the outcome of the trial. Nor can we make that determination on the partial record provided by plaintiff. "Reviewing a discretionary evidentiary ruling necessitates an examination of the record to determine if substantial prejudice resulted." *Leary v. Eng*, 214 Ill. App. 3d 279, 284 (1991). As the appellant, it was plaintiff's burden to provide this court with a sufficient record to enable us to address his claims of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984); *Landau & Associates, P.C. v. Kennedy*, 262 Ill. App. 3d 89, 92 (1994). He did not do so here.

Without a complete trial court record, we have no way of measuring the significance of any alleged error against the remaining evidence not in the record. "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch*, 99 Ill. 2d at 392. Upon reviewing the record presented, we can find no error.

¶ 54          B. Refusal to Instruct Hudson to Refrain from Mentioning Photographs

¶ 55     Plaintiff next contends that the trial court abused its discretion in refusing to preemptively instruct Hudson to refrain from referencing any Prius photographs during her testimony. Plaintiff argues that, as a result, a new trial on damages is warranted. In response, defendant notes that plaintiff has failed to cite case law to support this claim of error and, in any event, was not prejudiced by the brief mention of the photographs.

¶ 56     Putting aside plaintiff's failure to provide supporting authority, his argument is meritless. Illinois Supreme Court Rule 219(c)(iv) (eff. July 1, 2002) provides that, as a sanction for failing to comply with discovery rules, the trial court may bar a witness from testifying concerning the issue to which the discovery failure relates. " 'The decision to impose a particular sanction under Rule 219(c) is within the discretion of the trial court and, thus, only a clear abuse of discretion justifies reversal.' " *Direct Auto Insurance Co. v. Bahena*, 2019 IL App (1st) 172918, ¶ 35 (quoting *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 120 (1998)). "An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Id.*

¶ 57     Here, as a sanction for defendant's failure to timely disclose the Prius photographs, the trial court barred defendant's witnesses from testifying regarding them. Plaintiff did not object to this course of action. Before Hudson testified, plaintiff asked that Hudson be instructed not to reference any Prius photographs. Defense counsel advised the court that he would not be asking any

questions regarding the photographs. Given counsel's reassurance, the court agreed with counsel that a preemptive instruction to Hudson was unnecessary. Under the circumstances, we find no abuse of discretion in the court's conclusion.

¶ 58 Even if the trial court did err, plaintiff cannot establish the requisite prejudice. Hudson mentioned taking photographs of the Prius when asked whether Uber had suspended her. Plaintiff made a prompt objection, and the objection was sustained. At plaintiff's request, the court struck both the question and answer. Hudson's reference to the photographs was not made in the context of force of impact, injuries sustained, or the extent of the damage to the vehicles. Indeed, at no point did Hudson testify about the content of any photographs, whether she had any photographs, or whether any photographs still existed.

¶ 59 Nevertheless, plaintiff claims prejudice in that "[Hudson's] testimony undermined [Ziejewski's] testimony, as it made it appear as if he had not been thorough in arriving at his opinions." For instance, plaintiff notes that defense counsel used this line of impeachment—lack of thoroughness—against Ziejewski when he questioned Ziejewski about the fact that he had not personally interviewed plaintiff, Hudson, or defendant. To be sure, defense counsel asked Ziejewski on cross-examination whether he had seen the Prius or photographs of it, and Ziejewski responded no. However, Ziejewski made clear that he *had* specifically requested them. Given that the photographs were not admitted at trial, the jury had no reason to believe that Ziejewski's failure to see photographs of the Prius was due to a lack of thoroughness on his part. (Indeed, because Hudson was a defense witness, the jury could have arguably inferred that any photographs, which were presumably in Hudson's possession and not produced to plaintiff's expert upon request or at trial, were favorable to plaintiff.)

¶ 60    Moreover, as noted, to warrant reversal on an evidentiary error, plaintiff must establish that "the 'error was substantially prejudicial and affected the outcome of trial.' " *Holland*, 2013 IL App (5th) 110560, ¶ 192 (quoting *Jackson*, 210 Ill. App. 3d at 471). Without a complete trial court record, we have no way to measure the significance of any alleged error against the remaining evidence and be able to conclude that it " 'affected the outcome of trial.' " *Id.* (quoting *Jackson*, 210 Ill. App. 3d at 471). Thus, plaintiff cannot meet his burden of establishing that Hudson's brief comment, that she took photographs of the Prius to send to Uber, caused substantial prejudice that affected the outcome of the trial.

¶ 61                    C. Denial of Plaintiff's Motion for a New Trial

¶ 62    Finally, plaintiff contends that the trial court abused its discretion by not ordering a new trial on damages due to defendant's discovery violation in failing to timely produce the Prius photographs.

¶ 63    "It is well settled that a motion for a new trial is addressed to the sound discretion of the trial court, and the trial court's decision will not be disturbed on appeal absent a clear abuse of that discretion." *Delvecchio v. General Motors Corp.*, 255 Ill. App. 3d 189, 193 (1993). "Under the appropriate circumstances, a trial court may order a new trial as a result of a discovery violation committed by the party who prevailed in the initial trial." *Kubicheck v. Traina*, 2013 IL App (3d) 110157, ¶ 29. We review for an abuse of discretion a trial court's ruling on a motion for a new trial based on a discovery violation. *Id.* ¶ 30. The sanction of granting a new trial is an abuse of discretion where it is "far out of proportion" to the defendant's violation and the plaintiff cannot show resulting prejudice. *Tinsey v. Chicago Transit Authority*, 140 Ill. App. 3d 546, 549 (1986).

¶ 64    In support of his argument that the trial court erred in denying his motion for a new trial, plaintiff relies on *Delvecchio*. There, the plaintiff automobile owner sued the defendant automobile

manufacturer for injuries sustained in an accident allegedly caused by an engine stall. *Delvecchio*, 255 Ill. App. 3d at 190. The defendant denied that the engine had stalled. *Id.* at 191. During discovery, the trial court entered an agreed order in which the defendant "agreed to produce [certain] documentation *sent to* the National Highway Traffic Safety Administration (NHTSA)" from the defendant in response to requests from NHTSA pertaining to allegations of engine stalling on specific vehicle models. (Emphasis in original and added.) *Id.* At the time of the parties' agreement, the defendant had 135 additional reports of engine stalling that had been *sent from* NHTSA to the defendant on those same vehicle models. *Id.* at 192. The defendant did not produce those 135 reports. *Id.* However, the plaintiff discovered the existence of the other reports before trial "through a Freedom of Information Act request." *Id.* On the first day of trial, the plaintiff moved to require one of the defendant's witnesses to bring them to court when he testified. *Id.* The witness did indeed bring the reports to court, and the plaintiff introduced them into evidence. *Id.*

¶ 65    Following a verdict for the defendant, the plaintiff moved for a new trial based, in part, on the defendant's "discovery abuse" in failing to disclose the 135 additional reports. *Id.* at 192. The trial court agreed that a new trial was warranted. *Id.* at 193. In its written order, the court first rejected the defendant's argument that there was no discovery violation, finding that the 135 reports " 'were clearly contemplated by [the] plaintiff's discovery requests' " and should have been produced. *Id.* at 199. It noted that all the undisclosed documents were " 'reports of stalls on vehicles with the same engine system as that in the plaintiff's car.' " *Id.* at 198. Having concluded so, the court next considered whether the defendant had a satisfactory explanation for its failure to produce the documents and found that it did not. *Id.* at 199. Finally, the court considered whether the defendant's discovery violation prejudiced the plaintiff and concluded that it had. *Id.* at 200. The court noted that five of the undisclosed reports "were very similar to the [plaintiff's] complaint

in several respects" and " 'many had been involved in accidents because of the stall.' " *Id.* at 198, 200. The court further noted that, although the plaintiff presented testimony from six people who had experienced stalls, none of them had been involved in an accident. *Id.* at 200. The court stated: " 'If these documents had been produced as they should have been, the plaintiff would have had an opportunity to interview those complainants as potential witnesses and perhaps change the course of the trial.' " *Id.*

¶ 66     The Fifth District affirmed on appeal. *Id.* at 204. The court rejected the defendant's argument that no discovery violation had occurred because it had technically complied with the parties' agreed order. *Id.* at 200. The court found that the order was evidence that the defendant had actually committed "discovery fraud," given that it had been "aware of the existence of 135 complaints sent *from* the NHSTA at the time it" agreed to disclose reports sent *to* the NHSTA. (Emphasis in original.) *Id.* at 200. The court stated: "This is an excellent example of the intentionally incomplete and misleading discovery compliance condemned by our supreme court." *Id.* (citing *Buehler v. Whalen*, 70 Ill. 2d 51 (1977); *Ostendorf v. International Harvester Co.*, 89 Ill. 2d 273 (1982)). The court stated further: "There can be no doubt that the material withheld was contemplated by the agreed order, regardless of the exact language used." *Id.* at 203. The court held that the trial court did not abuse its discretion in granting a new trial, where the court, "[a]fter carefully reviewing the circumstances, *** found that an intentional discovery violation had occurred and that a party had been prejudiced." *Id.* at 200.

¶ 67     Here, plaintiff contends that

> "*Delvecchio* stands for the broader proposition that just because a non-offending
> party ultimately has the information at the time of trial and secures its desired remedy, that
> does not absolve the offending party from the consequences of discovery abuse. In other

words, if there is prejudice to the non-offending party, an offending party's discovery abuse is not as simple as no harm, no foul."

Plaintiff asserts that defendant's untimely disclosure prejudiced him because it deprived him of a theory of his case. According to plaintiff, if Ziejewski had had the Prius photographs, Ziejewski would have testified that plaintiff's angular acceleration was over 4,500 radians per second squared. Plaintiff argues that this was greater than what the jury heard—3,400 radians per second squared—and would have established that plaintiff's brain injury was more severe. Thus, according to plaintiff, it is reasonable to infer the jury would have awarded more damages.

¶ 68    Before addressing plaintiff's argument, we note that the record does not contain a report of proceedings from the hearing on plaintiff's motion for a new trial. See Ill. S. Ct. R. 323(c), (d) (eff. July 1, 2017). The record contains only the trial court's order denying the motion "[f]or the reasons stated on the record." Defendant maintains that, as a result, this court must presume that the order was entered in conformity with the law and had a sufficient factual basis. See *Foutch*, 99 Ill. 2d at 392 ("As there is no transcript of the hearing on the motion to vacate here, there is no basis for holding that the trial court abused its discretion in denying the motion.")

¶ 69    In his reply brief, plaintiff argues that a report of proceedings is "not necessary to resolve this case." According to plaintiff, "all of the issues raised by [p]laintiff were real-time evidentiary and discovery issues during trial, ruled on in real-time by the trial court." Plaintiff insists that the "court's explanation [for] its rationale 10 months later, if such rationale was even given during the post-trial hearing, is not necessary for this [c]ourt to review for error." Alternatively, plaintiff argues that if we believe a report of proceedings is necessary, he should be allowed to supplement the record. (We note that plaintiff moved to supplement the record with a report of proceedings only after defendant filed his brief, and we denied the motion.)

¶ 70    Here, given the absence of a report of the hearing on plaintiff's motion for a new trial, we have no way of knowing the basis of the trial court's ruling. Although plaintiff suggests that we need only rely on the court's rationale for its ruling at trial regarding the Prius photographs, plaintiff is not challenging the court's decision to bar the Prius photographs. Instead, plaintiff is challenging the court's ruling to deny plaintiff's motion for a new trial despite its earlier ruling to bar the photographs—a sanction with which plaintiff agreed. This necessarily requires us to consider the court's rationale as to the subsequent ruling. We cannot do so without a complete record. See *Cardona v. Del Granado*, 377 Ill. App. 3d 379, 386 (2007) ("Due to the inadequate nature of the record," which rendered "meaningful review of the defendant's contention *** impossible," the court presumed, per *Foutch*, that the trial court's order granting a new trial was entered in conformity with law and had a sufficient factual basis). Indeed, we must presume that the trial court, armed with all the necessary information, properly determined that a new trial was not warranted.

¶ 71    *Foutch* principles aside, on the record before us, *Delvecchio* does not warrant a conclusion that the trial court's denial of plaintiff's motion for a new trial was an abuse of discretion. Plaintiff's entire argument is premised on his claim that he was prejudiced by defendant's untimely disclosure of the photographs. However, his argument overlooks the fact that, before considering prejudice, the *Delvecchio* court first considered the nature of the discovery violation. The *Delvecchio* court strongly emphasized the intentional nature of the defendant's discovery violation—indeed, referring to it as "discovery fraud." *Delvecchio*, 255 Ill. App. 3d at 200. The discovery violation in this case is not comparable.

¶ 72    Here, after defense counsel referred to the photographs in opening statements, plaintiff's counsel advised the trial court that they had not been provided in discovery. Defense counsel

explained that he had first received the Prius photographs from Hudson in August 2022, approximately nine months after she referenced them at her deposition, and mistakenly believed that he had then disclosed them to plaintiff. Nevertheless, he noted that he had anticipated using the photographs at trial and provided them to plaintiff along with other possible exhibits on the Friday before trial. When plaintiff complained that the disclosure was not timely, the trial court agreed and, as a sanction, barred the photographs. Defense counsel's inadvertent omission is simply not analogous to the discovery fraud that warranted a new trial in *Delvecchio*. Indeed, unlike in *Delvecchio*, it was defendant who sought to admit the photographs at trial. This is not the type of "intentionally incomplete and misleading discovery compliance" at issue in *Delvecchio*. *Id.* at 200.

¶ 73      Further, we find no apparent prejudice. Plaintiff claims that Ziejewski was deprived of the meaningful use of the photographs, which would have been material to the severity of plaintiff's brain injury and would have established that the injury was more severe. However, even without the photographs, Ziejewski was already well aware that the Prius had been damaged in the accident. Despite having evidence that the Prius *was* actually damaged, Ziejewski made clear that he arrived at his conclusion—that "the forces associated with th[e] collision or actually angular accelerations of the head were more than sufficient to cause mild traumatic brain injury"— *regardless* of any damage to the vehicles. He testified that the angular acceleration rate was "*in excess* of 3,400 radians *** per second squared." (Emphases added.) He stated that he "did the analysis assuming no damage, zero damage." However, he continued: "That's not the case, there is some damage. So the—it [the rate] would be higher than what I am showing." When asked whether damage to the vehicle increased the radians squared and the likelihood of a mild traumatic

brain injury, he agreed that it did. He stated: "Obviously any damage would *** simply make the numbers bigger."

¶ 74    Thus, plaintiff cannot meet his burden of showing that he suffered prejudice from defendant's failure to disclose the Prius photographs. The jury heard testimony from Ziejewski that, even without damage to either vehicle, the forces "were more than sufficient" to cause the injuries allegedly sustained by plaintiff. Ziejewski also explained to the jury that any damage to the vehicles would increase those forces as well as the likelihood of injury. And the jury heard testimony that the Prius *was* damaged. Indeed, it heard testimony from Hudson regarding the nature of the damage. Hudson testified: "It was like the imprint of the license plate on the back of the bumper, so you could see like the red imprint, ink." She also testified that "the back bumper *** had to get replaced." She explained: "The side of the bumper was sticking out." The jury also saw photographs of, and heard testimony regarding, the damage to the Fusion. (Presumably, the police report and the officer's testimony, neither of which is included in the record, also included a description of the damage to the Prius. It is also possible that defendant described the damage in his testimony, which is also not included in the record). Thus, given Ziejewski's testimony, along with the evidence of damage to the Prius, the jury had ample evidence upon which to conclude that, as Ziejewski explained, the forces were greater than his "conservative" estimate and increased the likelihood of traumatic brain injury.

¶ 75    Accordingly, based on the limited record before us, we have no reason to believe that, if Ziejewski had the benefit of the photographs, the jury would have reached a different conclusion. As defendant notes, Bajwa's testimony disputed the nature and extent of plaintiff's injuries. Bajwa testified that, in his 18 years of experience in seeing patients, he had never seen someone with a similar "one-time mild concussion" suffer from long-term cognitive issues. This conclusion was

based, in part, on plaintiff's normal CT and MRI results and early signs of improvement. Thus, if the jury credited Bajwa's testimony, then even if Ziejewski testified that the forces were greater and a brain injury more likely, the jury would not have reached a different result, because Ziejewski's testimony could not negate plaintiff's CT and MRI results and his early signs of improvement.

¶ 76  Because the record here does not support the conclusion that plaintiff's discovery violation rose to the level of the violation at issue in *Delvecchio* and resulted in prejudice to plaintiff, we have no basis upon which to conclude that the trial court's failure to order a new trial was an abuse of discretion.

¶ 77                                III. CONCLUSION

¶ 78  For the reasons stated, we affirm the judgment of the circuit court of De Kalb County.

¶ 79  Affirmed.